[Criminal No. 844.   Filed June 29, 1937.]

[69 Pac. (2d) 569.]

## BEN KNIGHT, Appellant, v. STATE OF ARIZONA, Respondent.

Mr. William J. Fellows, for Appellant.

Mr. Joe Conway, Attorney General and Mr. W. E. Polley, his Assistant; Mr. Harry Johnson, County Attorney, and Mr. Earl Anderson, his Deputy, for the State.

ROSS, J.—The appellant, Ben Knight, was tried in the superior court of Maricopa county for murder in the first degree and found guilty. He was sentenced to suffer death, that being the penalty fixed by the jury in its verdict. In his appeal he complains (1) of the court's refusal on his motion to withdraw from the jury first-degree murder, there being no evidence, as he contends, to sustain such degree; (2) of error in instructions "in that the court did not sufficiently define 'robbery' or 'perpetration' and did not explain the difference between robbery and larceny, which was misleading to the jury to the prejudice of defendant"; (3) of the court's refusal on his motion to declare a mistrial on the ground that "there had been distributed information and instructions" to the jury, in pamphlet form, purporting to be signed by three of the judges of the superior court of Maricopa county.

The facts necessary to a consideration of these assignments are almost entirely circumstantial and may be stated as follows: On December 29, 1935, about six miles southwest of Coldwater, in a thicket of desert growth some fifty feet from a little traveled desert road, in a cotton picker's sack, was found the dead body of J. C. (also known as Charlie and Chuck) Kalb. Fractures of the skull, inflicted with a blunt instrument, were the cause of death. Tracks of an automobile indicated the body had been carried there. There was nothing in the dead man's clothes, such as cards, letters or papers, or other effects, by which he could be identified. Later, about January 5, 1936, two local residents, while traveling a road near the Gila River, had their attention attracted to marks on the ground indicating that something had been dragged across the road and, following these marks into a nearby thicket of salt cedar, discovered two puddles of blood, a wrench, a pair of pliers, and the butt of a cigarette.

There were no signs of any struggle in the road or elsewhere. This place is about one or one and one-half miles from where the dead body of Kalb was found and in the Gila River bottom.

Appellant being suspected of the killing was located and arrested at Venice, California, on or about January 12, 1936.

While here in Arizona he was living with a woman, by the name of Vesta Baker, as his wife, and her two minor children, and during the months of November and December they lived near Coldwater and worked as cotton pickers. The deceased also was a cotton picker and he and appellant first met near Buckeye, a few miles west of Coldwater. About that time appellant sold his second-hand automobile to someone near Buckeye. The deceased owned a Studebaker Big Six coach, two-door sedan, and he and appellant made a trip into California in it looking for work, but returned along about December 23d. They were gone only a few days. These two men were together in and about Coldwater for two or three days before Christmas. The Baker woman lived a few miles from Coldwater, on the south side of the Gila River, and on Christmas Day she had the appellant and the deceased at her home for Christmas dinner. On the 26th day of December appellant, Kalb, and Mrs. Baker and her children moved to Phoenix and rented and moved into a cabin of the Rainbow Auto Court on East Van Buren Street. The owner of the cabin testified:

"He (appellant) asked me how much the cabin would be and I asked him how many people he had and he said there was himself and his wife and two children and his brother-in-law, and he says his brother-in-law would sleep in the car, but that he would only be there a day or two, and so I told him it would be $2.50 a week, and he rented the cabin."

The deceased's possessions consisted of a supply of bedding, camping equipment, and the Studebaker, and all these were moved to the cabin.

On Friday morning, December 27th, appellant and deceased left the cabin in the Studebaker in search of work. The deceased never returned, but appellant did late that evening and inquired of Vesta Baker if deceased had come in. It appears that after deceased and appellant left the auto court they first went to Grand Avenue to several lettuce sheds in search of work. They then visited a lettuce shed south of Tolleson. About 2 o'clock they appeared at Coldwater and loitered around there until about sundown. Deceased made a small purchase at a store there and exhibited several dollars in paper money. This money was not found upon him.

On Saturday evening, December 28th appellant, along with Vesta Baker and her two minor children, left East Van Buren Street in the Studebaker car and on Sunday morning, the 29th, arrived in Venice, California, and stopped with appellant's brother John Knight. Appellant read in the newspapers of the discovery of Kalb's body and immediately stored the Studebaker in a private garage which he rented. He removed the two front tires and the battery. He stored the deceased's camping equipment at his brother's house.

When arrested January 12, 1936, he told the officers that he came to California in a Model A Ford truck with a man named Wilson. He shortly repudiated this story and told the officers that on Friday morning, December 27th, he and the deceased met a man on Grand Avenue whom neither of them knew; that later Kalb disappeared with this stranger; and that about 9 o'clock that night the stranger came back and told him that Kalb wanted appellant to take the Studebaker to Los Angeles and leave it on Town Avenue between

Fifth and Sixth Streets. Appellant told the officers that he asked the stranger where Kalb was and was told he was up at another lettuce shed; that he was in some kind of a mix-up and could not come down to talk to appellant. The stranger, according to Knight, threatened him and told him that if he didn't follow instructions he would get into serious trouble. That it was because of this warning and accompanying threats that he took the Studebaker and the deceased's personal effects.

When deceased was killed he had upon his person some cards, papers, and a small amount of gold dust. When appellant was arrested he had the gold dust, and he told the officers that he had panned it himself in Northern California and that it was his personal property. When appellant was returned to Arizona he repeated the story to the officers about the mysterious stranger. He then sent for the sheriff of Maricopa county and told him that he wanted to tell the true story, which was that he had gone to the river bottom with Kalb and that he had killed him there; that it came about in this way: That he and deceased had gone together over to what is known as the Simmons place for the purpose of stealing a wood saw; that they had taken along with them a number of tools, such as monkey wrenches, hammers, and files, to be used in detaching the saw from the tractor to which it was fastened; that when they tried to take the saw from the tractor they found they could not do it —anyway that it was too heavy to carry to the automobile which they had left at some distance from the saw. That they abandoned their intention to steal the saw, and as they returned to the Studebaker the deceased proposed that they rob the Bradley store located in the neighborhood; that he refused to join deceased, stating that he was on parole and that he did not want to do anything that would violate such parole; that

they quarreled over the proposition, and as they walked along in the dark the deceased struck him with a 10-inch Stillson wrench he was carrying; that he fought back striking the deceased with a ball-peen hammer; that he dragged deceased into the brush, from where he fell in the road, and while he was still alive got from the automobile a cotton picker's sack and put the deceased into it; that he at first thought of loading the sack with rocks and depositing the sack in the Gila River, then changed his mind and took the rocks out of the sack, put the body and sack into the automobile, and drove to the place where the body was found.

He admitted he destroyed a number of things that belonged to the deceased and threw others away; that he washed the blood stains from the car and threw the floor carpet thereof into a canal.

The autopsy showed that there were two mortal wounds in the back of and on the left side of deceased's head, about one and one-half inches apart. In both the skull was fractured and broken so that pieces of bone were freed from the surrounding tissues making holes in the skull reaching the brain. These and some less serious wounds and scratches on the face were the only marks or abrasions on the deceased.

Under this evidence, should the court have taken from the jury any consideration of first-degree murder? Appellant contends it should. "Murder" is the unlawful killing of a human being with malice aforethought. Section 4583, Revised Code of 1928. When the killing is willful, deliberate, and premeditated, or when it is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, or mayhem, it is murder of the first degree. Section 4584, Id. It seems the circumstances here might well bring the case within either or both of the categories constituting first-degree murder. There is evidence from

which the jury could reasonably conclude that the killing was willful, deliberate, and premeditated and that it had been planned and carefully thought out before its commission. If so, it was willful, deliberate, and premeditated and of the first degree. If the killing was committed so that appellant could go through deceased's clothes and take any money or other things of value therefrom, or for the purpose of appropriating the deceased's Studebaker, camping outfit, and other effects, it was done in the perpetration of robbery, which the statute makes first-degree murder. As is said in *State* v. *Evans,* 145 Wash. 4, 258 Pac. 845, 848:

"There is, in our opinion, evidence in the record from which the triers of the facts could well find that the purpose of the killing was to enable the person committing the act to perpetrate a robbery. Indeed, we think the evidence very conclusively shows that this was the sole purpose of the killing. . . . A person can form a premeditated design to effect the death of another for the purpose of better enabling him to rob the person or premises of that other. . . . The evidence indicates that the killing was the first of the immediate acts constituting the crime, and that the robbing was secondary. In such a case the state may properly charge that the killing has been done with a premeditated design to effect the death of the person killed and may show a robbery immediately following the killing by the person doing the killing, as part of its proofs of the charge. Such acts are part of the *res gestae.*"

So, we conclude the first assignment is without merit.

The complaint, that the court did not sufficiently define "robbery" or "perpetration," or explain the difference between robbery and larceny, hardly raises any question for this court to pass upon. An inspection of the instructions shows that the court defined "murder" in its various degrees in the language, or practically the language, of the statute; that

it also correctly defined robbery. No request was made by appellant for any amplification of these instructions nor for any definition of the word "perpetration." Nor can we see wherein appellant's rights were prejudiced by the court's failure to distinguish in its instructions the difference between robbery and larceny.

We have carefully read the pamphlet entitled, "Instructions to the Juror from the Judges of the Maricopa County Superior Court," which had been distributed to the general panel of the jury and on account of which appellant, in the midst of the trial, made a motion that the court declare a mistrial and discharge the jury. We have not been able to discover anything in the pamphlet that would have the least tendency to prejudice the rights of any litigant, whether civil or criminal. On the contrary, the pamphlet contains some very wholesome and helpful advice to jurors, which, if followed, would not only advance the administration of justice but remove many of the objections to and criticisms of the jury system. What was done was for the education of the jurors to better perform their duties in deciding cases.

This is not the first time trial judges have issued instructions to jurors and prospective jurors as to how they should conduct themselves and the rules that should apply in determining the facts of cases submitted to them. The jury commissioner who, under the superior court's instruction, distributed the pamphlet, testified he was in Detroit, Michigan, in the summer of 1935, and got a copy of a pamphlet used by the courts of that state, and made up from it the one here handed jurors. Such practice is followed by some of the trial courts of New York, American Bar Association Journal, page 401, June, 1925; also the state of Kansas, American Bar Association Journal, page 410, July, 1928; also the state of Washington,

American Bar Association Journal, page 282, May, 1931. If anyone has questioned the trial courts' right to issue instructions to jurors, we have not been able to locate the case. Appellant has not in his assignment or in his brief pointed to anything in the pamphlet calculated in the least to harm his cause.

The jurors did not believe appellant's story that he killed in self-defense. Their verdict on the facts, no error in law appearing, requires that the judgment and sentence be not disturbed. The record shows that appellant had a fair and impartial trial.

The judgment is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.