366

# KLETTKE v. STATE.

No. A-11248.   Oct. 25, 1950.

Rehearing Denied Nov. 15, 1950.

(223 P. 2d 787.)

Willis R. Stark and Gomer Smith, Jr., Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J.  The plaintiff in error, Max Eugene Klettke, hereinafter referred to as defendant, was charged by information filed in the district court of Oklahoma county with the crime of murder, was tried before a jury, convicted and his punishment fixed and assessed at death, and judgment was duly entered by the court in accordance with the verdict. The date of execution of sentence fixed by the court has been stayed, appeal having been perfected to this court.

Counsel for defendant in brief urges as grounds for a new trial two specifications of error:

"(1) Said court erred in overruling defendant's second motion for new trial, based on newly discovered evidence and offered subsequent to the imposition of sentence.

"(2) The judgment and sentence of 'death' passed upon the defendant was excessive and unwarranted under the evidence and the facts."

Counsel does not contend in his first specification of error that the "newly discovered evidence," forming the basis for the filing of the motion, has any bearing on the guilt or innocence of defendant of the crime charged. Rather, the proposition involves the question of whether certain remarks made and information imparted by the presiding judge to the entire jury panel prior to the trial of any cases in the various court divisions, may have prejudiced defendant's rights and influenced the jury in assessing the extreme penalty.

A consideration of the second specification of error at the outset is indicated in that both propositions require a review of the evidentiary matters.

The record discloses that on the morning of November 3, 1948, a school bus driver making an early morning drive west along a dirt road running out of Arcadia and in Oklahoma county, noticed, as he crossed a wooden bridge, a blanket on the shoulder of the road, and he got out of his bus to investigate and looked into the dry creek bed and noticed a dead man; the blanket was blood stained. Officers were notified, the body was taken in charge by a funeral home. The victim had been shot in the back of the head four times, one bullet coming out of his left eye, one out of his left cheek, and two remaining in the head. The deceased's pockets had been emptied, except a shirt pocket in which the officers found a slip of paper with the names "Joseph and Helen Miskisnick, Corfu, New York" typed on it, and also a garage ticket made out the day before, November 2nd, from Joplin, Mo., and on it was the word "Buick", and the address: "Arizona." Further, a note book was found with the name "Carl Beach" across one page.

U. S. Threatt, a colored man, testified that he operated a service station and grocery store three miles east of Luther, and eleven miles from Arcadia, and that on the night of November 2, 1948, at about 8 o'clock, an old man drove a 1938 model Buick automobile, with New York tag, into his station and had him fill it with gas; that the old man went into the filling station to pay wife of the witness for the gas and witness was wiping the windshield and headlights, and two boys got out of the car, one being the defendant who was larger and older than the other boy, and the defendant made witness

somewhat apprehensive by not asking, but telling witness, to give him a cigarette. Witness further testified:

" * * * and then he said, after I give him the cigarette, then he said, 'You see that old grey-headed son-of-a-bitch in there?' Well, I never did say anything. He said, ''He picked us up day before yesterday' or, 'he picked us up yesterday, and he hasn't even as much as offered us a cigarette or a cup of coffee.' The young kid said to this fellow here, he said, 'Come on', and he rushed on the inside of the station; and I stopped cleaning the lights and I went inside the station and I stood between those two boys and the old man that was paying my wife, the old man having his back turned to the two boys and also turned to me too, and he was very nervous. I don't know whether he was scared or had been drinking, but as he was getting his money he was shaking as he was getting it out of his pocketbook, and he paid my wife, and stood there a few minutes, and he said, 'Well'. One of the—the young boy hunched the other boy and said, 'Come on, let's go.' What they were mumbling about, I don't know. They went on back out and stood on the north side of the car, and it wasn't long they got in the car. Which one of them got in the back, I don't know; which one got in the front, I don't know; but the old man said, 'Well good bye, I will be seeing you all,' and he went out of the station."

Witness further described the Buick car in some detail, and stated that on November 3rd he was called to the Baggerly Funeral Home at Edmond to view the body of the dead man that had been found in the ditch near Arcadia, and he identified the body as that of the old man who had purchased the gas from him the night before.

The Oklahoma county officers by 'phone calls to Corfu, New York and elsewhere soon identified the deceased as a retired railroad section worker of that place, who had left there driving a 1937 Buick automobile with

destination at a point in Arizona to visit a brother; the serial number of the car, year and make, etc., were obtained, and the officers broadcast a pick-up order for the Buick car and the two boys last seen with the deceased.

In the meantime, a parking yard attendant at Fort Worth, Tex., on November 4, 1948, had noticed what appeared to be a bullet hole in the left front vent of a 1937 Buick car and noticed blood stains on the right front seat and door, and he notified the officers, who awaited the return of the defendant and one Harry Eugene Riskin, placed them under arrest, and found a .38 calibre U. S. revolver in the suitcase. The district attorney for Tarrant county, Texas, was called to take the confession of the defendant, Max Eugene Klettke, who was advised of his constitutional rights, but readily confessed to killing Carl Beach in order to obtain his money and his car.

The Oklahoma county officers were notified of the arrest, and the prisoners were brought to Oklahoma City, where Klettke made a second signed confession before an assistant county attorney for Oklahoma county. The purported facts recounted were practically the same as in the Fort Worth confession in essential matters, except in greater detail, and especially with reference to the disposition of the body. The record shows that prior to the confession defendant was again advised of his constitutional rights, and that thereafter he obtained counsel of his own choosing.

Pictures of the deceased prior to removal from the ditch were made, also of the roadway, pictures of the Buick car as it appeared on seizure in Fort Worth were made, as was the pistol found in defendant's grip, and all were introduced in evidence after proper identification. Witnesses, in addition to Threatt, testified to see-

ing defendant at the Threatt service station with the deceased the night of November 2, 1948.

The Fort Worth confession being in narrative form, less formal heading, will be quoted. It reads:

"I, Max Eugene Klettke, am 23 years of age, and my home is in Lansing, Michigan. On Sunday night, October the 31st, 1948, a boy by the name of Harry Riskin and I rented a car from the Rent-A-Car Company of Lansing, Michigan. Our idea at that time was to take this car and drive it to Galveston, Texas, where we would look for work. When we left there Jack had a change of clothes with him but I didn't have any. I did have though, a .38 caliber revolver which I had about four or five months. It is the same U. S. Revolver, Company revolver, Number 18228, which you show me and which I had in my possession when I was arrested at Fort Worth, Texas.

"The car that we rented was a black two-door black Chevrolet sedan 1948 model. We drove this car down thru the town of Fort Wayne, Indiana, to a little town this side where we were nearly out of gas and we decided to leave the car there. We hitchhiked to Indianapolis, Indiana. We left Indianapolis about 3:00 P.M. on November 1st and just outside Indianapolis caught a ride with a man in a 1937 Buick. This man whose name I later found out to be Carl Beach was on his way to Miami, Arizona. After he picked us up and told us where he was going he told us that he would carry us as far south as he was going which was to be Amarillo, Texas.

"We were driving on U. S. Highway #40 which was to take us to Oklahoma City, Oklahoma. On Tuesday afternoon, November 2, we stopped at Miami, Oklahoma, to get a wind shield wiper fixed. There Harry and I talked about knocking the owner of the car in the head and taking his car and money. We decided to do this some place on the highway where there was not any traffic or anyone around. Some time after dark about one hour I would say, and before we got into Oklahoma City, I took the pistol from under some things that were on

the top of the back seat and fired at Beach's head. I don't know how many times that I shot or how many times that I hit him and I don't remember anything more until we took his body out of the car. I do know that the gun was empty the next time that I looked at it and I do know that it was full before I shot. When we took his body out of the car it was wrapped in a blanket and we threw it down in a ditch over the bridge on the side of the road. We got something about one hundred and fourteen dollars off of his body. We later found another billfold in the car with three hundred and fifty dollars in it. We, Harry Riskin, and I, drove into Oklahoma City and spent the night at the Hudson Hotel. I registered under the name of Max Palmer and he under the name of Jack Springer. The next afternoon, November 3rd, we drove to Fort Worth, Texas, where we stopped at the Siebold Hotel and parked the car at the Allbright Parking lot. We registered under the same names we used in Oklahoma Ctiy. We spent some of the money that we got off of the man we killed in Oklahoma City for clothes and some for clothes in Fort Worth."

In the Oklahoma City confession defendant stated that he and Riskin first discussed hitting Carl Beach over the head at Joplin Mo., defendant was asked:

"Q. Were you mad at him? A. No, not necessarily. I was mad in a way because he wouldn't even buy us a package of cigarettes. I wasn't mad enough to shoot him. I mean, I wasn't mad at him. Q. The purpose of shooting him was just to get the money he had on him? A. Yes, sir. * * * Q. Did Mr. Beach say anything after you shot him? A. Jack said he said 'what was that?' and he grabbed his leg and he said when he grabbed his leg it hurt him. Q. What did you say? A. I don't know. I don't remember saying anything."

In addition to the gunshot wounds, a bruise was found on the deceased's legs when he was examined at the funeral home.

The evidence brought out that the first shot had missed the victim and passed through the left side vent of the car, and the victim turned his head to his right, and defendant, from the rear seat, continued shooting. The defendant and his companion turned off the ignition, grabbed the steering wheel and brought the car to a stop and the defendant got under the wheel and drove the car thereafter; the body was disposed of after removal of all valuables, including a ring from a finger.

At the close of the state's evidence defendant took the witness stand, but prior to testifying was advised of his constitutional right to refrain from testifying. Defendant did not deny any statement contained in his two written confessions or take issue with any of the testimony of the state's witnesses, except with reference to a statement of Threatt, the colored service station operator. Defendant stated that he did not remember using any abusive language against Mr. Beach, and denied saying, "Give me a cigarette", but said, "Will you give me a cigarette?" He admitted killing Carl Beach for his car and money.

Defendant on direct examination stated that his mother died when he was about four years old, and that he had lived with an aunt most of his life and in Lansing, Mich.; that he nearly completed the ninth grade in school; that his father sent money to his aunt for room, board and clothing; that his aunt was strict with him, and after school hours he helped his uncle, who was a cook, by washing dishes and mopping floors. After he was twelve years of age he lived with his father off and on for several months at a time, but after his father remarried he could not get along with his step-mother and finally could not get long with his father. He told about making several trips to California and about the country, and was in

the merchant marine for a while; was arrested in Michigan for stealing a car and placed on probation with an aunt for 18 months. He stated that the county attorney of Oklahoma county had not told him at the time of his confession that he might ask the jury to send defendant to the electric chair. On cross-examination defendant admitted being on parole from the Ithaca, Mich., reformatory at the time he purchased the pistol with which he subsequently shot and killed Carl Beach, and gave the details of his driving away the Rent-A-Car automobile and commencing his trip with the destination of Galveston.

Clearly counsel's contention "that the judgment and sentence of 'death' passed upon the defendant was excessive and unwarranted under the evidence and facts", in view of the record in this case, is not tenable. We have carefully studied the entire record, including the instructions given the jury by the court, and none of which were objected to by counsel. The record shows a calculated planning and premeditated design to effect the death of Carl Beach, which plan was coolly and deliberately and brutally carried out, in violation of law. Tit. 21 O.S.A. § 701(1). The record discloses no extenuating circumstances; and by reason of their qualifying answers on voir dire and oaths, nothing in defendant's testimony, if wholly true, could reasonably have been considered by the jurors in mitigation. In the case of Prather v. State, 76 Okla. Cr. 385, 137 P. 2d 249, 250, this court held:

"Where the testimony clearly shows an aggravated case of murder, Criminal Court of Appeals will not interfere with verdict of jury upon the ground that the death penalty is excessive punishment and should not be inflicted."

Nevertheless, if the matters complained of in counsel's first specification of error constituted fundamental

error, or a substantial violation of a constitutional or statutory right, it follows that the defendant would be entitled to a new trial. Otherwise, the case must be affirmed. Tit. 22 O.S.A. § 1068.

By second motion for new trial filed some two months after the defendant had been sentenced, counsel complains about certain remarks made by the presiding judge to the entire jury panel prior to the selection of a jury from the panel to try the defendant. Counsel contends that it is not incumbent upon the defendant to affirmatively show that by reason of such remarks that he was denied a fair and impartial trial, or that his substantial rights were prejudiced thereby. The presiding judge, who gave the "indoctrination" talk to the jury panel, but who was not the trial judge in this case, was Judge A. P. Van Meter. He was examined by counsel for the state concerning his remarks and stated that he discussed the duties citizens owe the state to serve on juries, the amount of work of the courts, etc. He further testified:

"I called attention to the fact that the trials in the common pleas courts did not involve as large sums of money as were involved in the district courts but that they should not lose sight of the fact that a man who had a small amount involved in a lawsuit had just as much right to have that case submitted and tried fairly as a man who had a large amount involved, and that his lawsuit was just as important to him as one that involved a large amount of money. And then, as I remember it, I discussed the difference between the criminal and civil cases. I called attention to the fact that in criminal cases the defendant had to be convicted beyond a reasonable doubt and in civil cases it was only necessary to establish the plaintiff's petition by a preponderance of the evidence. And then I believe I mentioned that in civil cases either side could appeal and in the criminal cases I mentioned to the jury that of course they had to find a man

guilty beyond a reasonable doubt before he could be convicted but it was well to bear in mind that in a criminal case if they should—that they should give it very careful attention and if they felt a man was guilty they should not turn him loose if they felt that way. They should remember that the law did not give the State any right to appeal but did give the defendant a right to appeal. * * *"

Counsel contends that if they had known of the remarks of the presiding judge they would then have been in a position and would have had opportunity to have thoroughly questioned the prospective jurors on voir dire as to whether or not they may or may not have been prejudiced by the presiding judge's remarks or whether or not it might or might not influence them in returning a verdict against defendant.

The record shows that the statements made by the presiding judge were oral, and made from notes on a card carried in his pocket and the points were worked up after a conference of the district judges and common pleas judges to insure uniform government of matters pertaining to the courts. Apparently, for a long time it had been the custom of presiding judge to make cautionary remarks to jury panels similar in nature to the remarks complained of, and counsel having been a member of the Oklahoma county bar for many years, so far as the record shows had never before considered such remarks improper.

The trial judge, Hon. Albert C. Hunt, in overruling defendant's second motion for new trial, stated, in part:

"The jury that tried this defendant was empaneled with a great deal of care on their voir dire. They were qualified by the county attorney's office for the death penalty and examined at length by counsel for the State and for the defendant, and they were all, as I remember, asked the final question if there was anything about which

they had not been asked or anything in their minds that would leave any doubt in their minds as to whether or not they could go into the jury box and consider all of the evidence and the instructions as given them by the trial judge and after having considered all those things if they could render a fair and impartial verdict and to resolve every doubt which they might have in favor of the defendant, and they all of course answered in the affirmative and were so qualified; and I cannot say that the statements made by Judge Van Meter constituted error in this case.

"Judge Van Meter was not instructing the jury, but merely making some general observations that the presiding judge may make to jurors at the time they are empaneled, they were just prospective jurors then. He made no reference to this case, or to any case, and while I have no criticism of Judge Van Meter, yet, notwithstanding that fact, if, by the wildest stretch of the imagination, I felt that it, in any way, militated against the rights of this defendant, I would not hestitate to grant a new trial, and I know the county attorney would expect me to do it if I felt so about it.

"I fully appreciate the seriousness of this case; any case where the death penalty is involved is a serious case, and it is always the purpose of this court to accord every defendant a fair and impartial trial, whether the death penalty is involved or not.

"This defendant was represented by able counsel of his own choosing, and considering the evidence and the whole record, I am fully convinced that he has had a fair and impartial trial, and all his constitutional and statutory rights fully safe-guarded and protected. * * *"

Two cases are cited to support defendant's contention of error, one being People v. Schoos, 399 Ill. 527, 78 N.E. 2d 245, 2 A.L.R. 2d 1096 (and see note at page 1104), and being a leading case, and the other being People v. Weatherford, 160 P. 2d 210, a California District Court of Appeals case.

In each of these cases printed pamphlets with quite extensive instructions as to the law applicable where certain issues involved (in addition to admonitions concerning the duties of jurymen) had been distributed among the jurors. The Attorney General would distinguish these cases from the present case in that in the within case admonition to the jury panel was oral and it is pointed out that the cautionary remarks were general, not detailed or at length as in the cases in question, and that there was nothing in the remarks that could have prejudiced the rights of the defendant. The state cites the case of People v. Tennant, 32 Cal. App. 2d 1, 88 P. 2d 937, a California Court of Appeals case, as applicable to the within case. There the court gave oral admonitions and made indoctrination remarks to the jury panel, and the factual situation appears to have not been materially different from the within case, and the action of the trial court was upheld. It is pointed out that this is one of the cases cited in 23 C.J.S., Criminal Law, § 1186, p. 725, as supporting the general rule concerning cautionary remarks to jury panels there announced, and being:

"The giving of cautionary instructions to the jury in regard to their duties is proper and rests largely in the discretion of the court; it is the duty of the court to give such instructions when necessary in the interest of justice. The court may instruct the jury to follow the law and the evidence and it may caution them against sympathy or prejudice."

We have made independent research, and do not find where the exact question involved has been considered by this court, but do find in Hudman v. State, 1949, 89 Okla. Cr. 160, 205 P. 2d 1175, a homicide case, where the prosecution read during argument to the jury an excerpt from the American Bar Journal on the duty of jurors. This court held that the reading of the article did not con-

stitute prejudicial error. The article, however, was of a somewhat more general nature than in the within case.

In the Schoss case, heretofore referred to, the pamphlet purported to instruct the jurors in general principles of law and court procedure, instructed them relative to reasonable doubt, credibility of witnesses, accessories, accomplices, alibis, and confessions, and tended to lead them to believe it to be their duty to favor the prosecution, etc. The appellate court found the pamphlet objectionable because it contained many statements that were contrary and misleading to laymen. The court pointed out, however, that:

"It does not follow that a pamphlet in the nature of the jury primer used in this case cannot be prepared and employed under any circumstances." The court in the Schoos case referred to People v. Tennant, supra, as presenting a different fact situation "from the extraordinary factual situation in this case." [399 Ill. 527, 78 N.E. 250.]

In People v. Weatherford, supra, the court, through Doran, Justice, held that a pamphlet containing general instructions on the duty and responsibility of trial jurors, including statements inapplicable to such prosecution, was prejudicial error, whereas the same court through the same justice in People v. Lopez, Cal. App., 185 P. 2d 831, held the distribution of a pamphlet concerning the duties and responsibility of trial jurors in the criminal department of the superior court was improper, but not so prejudicial as to require a reversal. This case was reviewed by the Supreme Court of California, People v. Lopez, 32 Cal. App. 2d 673, 197 P. 2d 757, 759, and the case was affirmed, but the distribution of the pamphlet was approved. Said the court:

"The constitution [providing for defendant's right to be present at all stages of the trial and to have the jury

instructed in his presence] does not contemplate keeping prospective jurors in a state of ignorance about matters of general information and concern to them, and neither the letter nor the spirit of the Constitution prohibits the giving of general, preliminary information which will make them better able to perform their duties in deciding cases.

"An enlightened administration of justice requires the intelligent service of well informed men and women, and there is obviously considerable value in acquainting jurors in advance of trial with a few elementary principles of law and procedure, and with the serious duties and responsibilities they are about to assume. It is immaterial whether they derive their knowledge from prior service as jurors in other cases or from the study of such a pamphlet. In either event, wholesome and helpful advice of the type found in this pamphlet should be of great assistance in securing to defendant a fair and impartial trial.

"There is no claim that any portion of the pamphlet is erroneous as a matter of law or is in conflict with the instructions given by the trial court, and we find nothing which could have been prejudicial to defendant. Although some of the statements were not applicable to this prosecution, it does not appear how they could have misled the jury or harmed the defendant, and it must be assumed that the jurors followed the specific instructions given at the close of the trial."

In State v. Miller, 90 Kan. 230, 133 P. 878, the trial judge at the opening of the term made a rather lengthy indoctrination talk to the jury panel, but the Supreme Court of Kansas, while cautioning trial judges in such practice, held that in that case the remarks did not constitute error.

In Knight v. State, 50 Ariz. 108, 69 P. 2d 569, the court approved the distribution of a pamphlet among jurors containing instructions to the general jury panel.

The subject is treated at length in articles in 11 A.B.A. Jour. 289; 14 A.B.A. Jour. 410; 22 N.Y.U.Q. 442; and 41 Ill. L. Rev. 187.

While we feel that trial courts should use great caution in giving cautionary instructions to a jury panel, and that such remarks should be general, should not be of a controversial character, and free from any question with respect to its factual and legal accuracy, and while we would not hesitate to grant a new trial if we were convinced such remarks prevented the accused from having a fair trial or prejudiced his rights, in the within case, after careful study, we have been unable to discover in the statements made by the presiding judge to the jury panel, any prejudicial effect against the defendant.

After a consideration of the entire record, the judgment must be affirmed, for, as stated by Judge Furman in the early case of Wilkins v. Territory, 2 Okla. Cr. 559, 103 P. 656, 658:

"It is an awful thing to take the life of a human being; but, as unpleasant as it may be, the law must be enforced. The jurymen or judges who fail to do their duty faithfully and fearlessly, thereby make outlaws of themselves, and are largely responsible for the shedding of innocent blood. The law, both human and divine, prescribes the death penalty for cases of willful murder. Courts and juries have the power, but they are without the moral right, to disregard the mandates of the law. Finding no error in the record, our duty is plain."

The time originally appointed for the execution of the defendant Max Eugene Klettke having passed pending this appeal, see Ex parte Grayson, 86 Okla. Cr. 86, 187 P. 2d 232, it is ordered, adjudged and decreed by this court that the judgment and sentence of the district court

of Oklahoma county be carried out by the electrocution of the defendant, Max Eugene Klettke, by the warden of the State Penitentiary at McAlester, Oklahoma, on Thursday, January 4, 1951.

JONES, P. J., and BRETT, J., concur.