**Monty Lee EDDINGS, Petitioner,**

v.

**The STATE of Oklahoma, Respondent.**

No. C–78–325.

Court of Criminal Appeals of Oklahoma.

March 21, 1980.

Rehearing Denied Sept. 15, 1980.

---

Jay C. Baker, C. Rabon Martin and Thomas E. Salisbury, Baker, Baker & Martin, Tulsa, for petitioner.

Jan Eric Cartwright, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for respondent.

## OPINION

BRETT, Judge.

Monty Lee Eddings murdered an Oklahoma Highway Patrol Officer on April 4, 1977. Because he was 16 at the time, the State moved to have him certified to stand trial as an adult. The motion was granted by the District Court after a hearing, and we affirmed the certification on appeal. *Matter of M. E.*, Okl.Cr., 584 P.2d 1340 (1978), *cert. denied*, 436 U.S. 921, 98 S.Ct. 2271, 56 L.Ed.2d 763 (1978). Subsequently, Eddings entered a plea of nolo contendere to a charge of Murder in the First Degree in the District Court, Creek County, Case No. CRF–77–118. After a hearing on the aggravating and mitigating circumstances, the District Court sentenced him to death. Title 22 O.S.Supp.1978, § 513, provides that the legal effect of a plea of nolo contendere shall be the same as that of a plea of guilty; and for that reason the case is before us on a petition for certiorari.

Title 21 O.S.Supp.1978, § 701.13, requires this Court to review the propriety of every death sentence. This review is in addition to any direct appeal taken by the person sentenced to death, but the Statute directs that the appeal and the sentence review shall be consolidated. Section 701.13 also provides that both the State and the convicted person shall have the right to present oral argument as well as briefs; and the instant case was argued on the 7th day of November, 1979.

I

The petitioner's victim was Patrolman Larry Crabtree of the Oklahoma Highway Patrol. The testimony of witnesses established that the petitioner had taken his brother's automobile, and that he and his sister and two friends had run away from their homes in Missouri. Before leaving, the petitioner had taken three of his father's firearms and had shortened the barrel on at least one–a .410 gauge shotgun. Before getting to the Turner Turnpike at the Tulsa gate, the group picked up a hitchhiker. They stopped at a service station/coffee shop for refreshments, and as they were leaving, the petitioner, who was driving, lost control of the car briefly because he had dropped his cigarette and was trying to find it. The car went over a curb and down into the bar ditch before the petitioner regained control, but he pulled back onto the highway and continued to-

ward Oklahoma City. A man who saw the incident told Patrolman Crabtree, who was in the coffee shop, and the officer said he would check on the matter.

As the runaways were driving along, one of the passengers in the back seat said there was a police car behind them. The petitioner said, "If the fucking cop harrasses me I'll shoot him." The passengers treated the remark as a joke; but when the officer turned on his red light and the petitioner pulled off the road, he took the sawed–off shotgun from the floor of the car and loaded it. When Patrolman Crabtree was about six feet away, the petitioner stuck the shotgun out the window and fired. Immediately he drove away.

Evidence was presented to the court concerning the petitioner's extensive juvenile record in Missouri. The product of a broken home, he was shuffled back and forth between his mother's house and his father's house, and also spent some time in "group homes" operated by the State of Missouri. A petition was filed in November, 1975, when the petitioner was 14, charging him with four counts of burglary in the second degree and tampering with a motor vehicle. He was adjudicated delinquent and made a ward of the court. In September, 1976, a supplementary petition was filed alleging assault with the intent to do bodily harm; and in that same month another petition charged burglary in the second degree and stealing. In addition, there was a charge of tampering with mail boxes. According to testimony, the petitioner's conduct steadily worsened until he was returned to his parents' custody. In March, 1977, the petitioner violated his probation by running away from home. He was found in Oklahoma and returned to Missouri.

There was also testimony of statements made by the petitioner both before and after he was taken into custody. As he drove away from the scene of the murder, he said he would rather have killed a cop than go back to where he lived. At one point after he had been taken to jail, he said to two officers, "If I got loose I would shoot you all, too." And at another time after having twice asked to have a light turned off, he told an officer, "Now I have shot one of you people, and I'll get you too if you don't turn this light out."

II

While the petitioner asks to be permitted to withdraw his plea of nolo contendere, all of his assignments of error relate in one way or another to the imposition of the death penalty in his case. He argues first that it would be cruel and unusual punishment to impose the death penalty on a juvenile. Next, he contends that his motion to strike the bill of particulars regarding the sentence should have been sustained, that none of the statutory aggravating circumstances were established beyond a reasonable doubt, and that the aggravating factors in his case were outweighed by the mitigating factors. In his third assignment of error, the petitioner claims that the State suppressed evidence which he could have used to counter one of the aggravating circumstances alleged in the bill of particulars. And, finally, he says he should have been given the services of an investigator and a psychiatrist at State expense. For the sake of convenience, we will discuss the petitioner's arguments out of order.

A

One of the aggravating circumstances found by the District Court was that the murder was committed "for the purpose of avoiding or preventing a lawful arrest or prosecution." Title 21 O.S.Supp.1978, § 701.12. The petitioner claims that the State knew, but failed to tell, of a witness who could have aided him in attacking this particular circumstance. This witness would have testified that although the traffic stop was made because of a misdemeanor committed by the petitioner in leaving the turnpike service station, Patrolman Crabtree did not actually see the offense; he merely heard of it from the undisclosed witness. Thus, the petitioner argues, the officer did not have the right to make a warrantless arrest. And this particular aggravating circumstance would not have

been found had the witness been brought to testify.

The petitioner had filed appropriate pretrial motions seeking disclosure of any exculpatory evidence held by the State. At the pretrial conference the prosecutor insisted that he knew of no evidence which would tend to establish the petitioner's innocence or limit the sentence. He agreed that if he did become aware of any evidence he would make it known to the petitioner, and the court so ordered in a court minute. The petitioner alleges that the State knew all along that the patrolman did not see the incident at the station. He cites *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); and *Blevens v. State,* Okl.Cr., 487 P.2d 991 (1971), in arguing that the District Attorney acted in bad faith in not only keeping secret his knowledge of the affair, but also in continuing to assert that a lawful arrest had been made.

The petitioner's assertions are called into question by the record. He alleges that he did not find out about the witness until the State had concluded its evidence of aggravation, on May 15, 1978; but on April 10, 1978, he filed a motion to strike the bill of particulars regarding the death penalty, and in that motion he said that "the evidence shows that Patrolman Crabtree was not making a lawful arrest, the offense for which the defendant was stopped being a misdemeanor not committed in the presence of the officer."

Also, we do not accept the petitioner's claim that the District Attorney was acting in bad faith by continuing to assert that a lawful arrest had been made. There are many reasons for making a legitimate traffic stop. The fact that the petitioner can attack one does not eliminate all others. We will discuss this issue in depth when we take up the aggravating circumstances.

B

■ The petitioner was not entitled to State funds to hire an investigator or a psychiatrist. He insists he was denied due process of law, but we have dealt with this question in the past. See, for instance, *Bills v. State,* Okl.Cr., 585 P.2d 1366 (1978), and *Dennis v. State,* Okl.Cr., 561 P.2d 88 (1977).

He claims that under 22 O.S.1971, § 1271, he would have been entitled to investigative and psychiatric assistance had he committed his crime in a county having a population in excess of 200,000. Section 1271 provides for the assistance of counsel at county expense for those who are unable to retain private counsel; but counties having a population in excess of 200,000 are expressly excluded from the provisions of this Section. Such counties are covered by 19 O.S.1971, §§ 138.1 et seq.; and § 138.6 provides for the employment of one or more investigators in the larger counties. There is no provision for psychiatric assistance.

■ In *Bills v. State,* supra, we held that the statutory distinction between the counties with 200,000 people or less and the counties with more than 200,000 people is not an unconstitutional discrimination. The petitioner has asked us to overrule *Bills,* but we still believe that case is correct. As we said there, indigent defendants in every county in the state are given the assistance of counsel, whether salaried under the public defender system or paid individually, at county expense. There is a rational basis for the division, since the larger counties undoubtedly have greater numbers of indigent defendants. It is a proper decision for the Legislature to make as to the point at which the case load justifies a full-time public defender as opposed to taking each case separately.

■ Nor are we offended by the provision for investigators in the larger counties. Such a system indicates an economically sound division of labor: If a public defender's office could not hire persons to concentrate on investigating cases then more attorneys would have to be hired, since without the services of the investigator each attorney would have to spend more time on each case.

■ It is true that the District Court was in error in finding that the petitioner was

not indigent just because he had retained counsel. See *Bruner v. State ex rel. Dist. Court, Okl. Cty.*, Okl.Cr., 581 P.2d 1314 (1978). But even if the court had correctly held him to be indigent, he would not have been entitled to the assistance he sought.

■ Finally, we do not see that the petitioner suffered any injury from the lack of assistance of either an investigator or a psychiatrist. The only specific point on which he urges that an investigator would have been beneficial is the so-called suppression of evidence by the prosecutor. But as we have noted, it appears that the petitioner did know about this issue. And even without the use of State funds, the petitioner presented the testimony of three expert witnesses: A psychologist from Eastern State Hospital, a psychiatrist in private practice, and a sociologist from Oral Roberts University who teaches courses in the area of criminal law. The petitioner says that the doctors' testimonies were significantly different from that which they gave at the certification hearing, and he attributes this to a lack of funds to pay for a reevaluation. But we have examined the transcripts of both the certification and the sentencing hearings, and the testimonies are not significantly different.

### C

Although the petitioner is now almost 19, he was 16 when the murder was committed, and he urges that youth should be considered an absolute mitigating circumstance barring application of the death penalty. In support of his argument, the petitioner cites *Roberts v. Louisiana*, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). *Roberts* involved a statute which required the death penalty if the murder victim was a peace officer engaged in the performance of his duties. In reversing the death sentence, the United States Supreme Court made the following comment:

"To be sure, the fact that the murder victim was a peace officer performing his regular duties may be regarded as an aggravating circumstance. There is a special interest in affording protection to these public servants who regularly must risk their lives in order to guard the safety of other persons and property. But it is incorrect to suppose that no mitigating circumstances can exist when the victim is a police officer. Circumstances such as the youth of the offender, the absence of any prior conviction, the influence of drugs, alcohol or extreme emotional disturbance, and even the existence of circumstances which the offender reasonably believed provided a moral justification for his conduct are all examples of mitigating facts which might attend the killing of a peace officer and which are considered relevant in other jurisdictions." (Footnotes omitted)

The petitioner reads this passage as stating that the death penalty can never be imposed if the offender is a youth, but we read it differently. It is our understanding, that the Supreme Court was saying it was wrong for Louisiana to mandate the death penalty without allowing for the consideration of possible mitigating circumstances. The Court did not say that the presence of any of these factors would bar the application of the death penalty, only that such factors should be taken into consideration in determining whether or not to impose the death penalty in a particular case.

■ Nor do we find merit in the petitioner's argument from Title 10 of the Oklahoma Statutes. Here again, he contends that the mere fact of his having been a juvenile at the time the murder was committed should bar the use of the death penalty. The petitioner's argument is not based on any particular sections of Title 10, but on what he believes to be the underlying philosophy of the juvenile code.

■ The underlying philosophy is rehabilitative. "The juvenile court is theoretically engaged in determining the needs of the child and of society rather than in adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society." *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

See also *Application of Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). There was always a realization that not all juveniles could be helped, and the Oklahoma Legislature provided from the beginning that under certain circumstances juveniles could be prosecuted in a regular criminal proceeding. Rev. Laws 1910, § 4424; and see Laws 1968, ch. 282, § 112, now 10 O.S. Supp.1978, § 1112.[1] Certification of a juvenile to stand trial as an adult is a legitimate aspect of the juvenile code, and it was applied in this case. *Matter of M. E.,* supra.

 The petitioner insists, however, that certification does not change the fact that he was only 16 when he committed the murder, and he argues that it would be both cruel and unusual to impose the death penalty on him for that reason. In a concurring opinion in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Justice Marshall discussed at length the history and development of the concept of cruel and unusual punishment.[2] He suggested that there are four different types of punishment which could be considered cruel and unusual: Those which are unusual in the sense of being previously unknown; those which are abhorred by popular sentiment; those which involve extreme physical pain and suffering; and those which are excessive and serve no valid legislative purpose.

Justice Marshall indicates that the original insertion of the word "unusual" in the phrase "cruel and unusual punishment" (in the English Bill of Rights of 1689) was inadvertent, and he says there is nothing in the history of the Eighth Amendment to the United States Constitution to shed light on its meaning. While Justice Marshall notes that capital punishment is certainly not unusual in the sense of being previously unknown, the petitioner in the instant case asserts that it would be unusual to levy the punishment on a juvenile, since it has never before been done. But the petitioner overlooks the fact that when he was certified to stand trial as an adult he was certified to be punished as an adult.

The petitioner asserts that the youngest person ever executed in Oklahoma was 18 when he committed his crime. And he cites *Ridge v. State,* 28 Okl.Cr. 150, 229 P. 649 (1924), in which this Court declined to impose the death penalty on a person who had committed murder at the age of 14. But in the Syllabus of *Ridge* this Court said:

"In this state, under the general provisions of criminal law and procedure construed in connection with the law relating to juvenile offenders, the death penalty should not be imposed against a boy under the age of 14 years convicted of murder, unless it clearly appears that the juvenile offender was a person with a sense of responsibility, intelligence, and understanding equal to that of an ordinary person of the age of 16 years. "To warrant the death penalty for a juvenile offender convicted of murder, the offense must be reprehensible in a superlative degree, coupled with the fact that the perpetrator was a person having an ordinary comprehension of the enormity of the offense and its consequences."

Clearly, as long as 55 years ago it would not have been considered unusual for a 16–year–old person to be given the death penalty. And under H.B. 1493, supra, a 16–year–old person accused of murder could be subjected to a regular criminal proceeding without having to be certified. The Legislature must have anticipated that such a youth could be given the death penalty. We hold that it would not be unusual, in the sense of the constitutional prohibition, to impose the death penalty on the petitioner.

---

1. In recent years there has been a growing belief that the protection of society demands stronger measures still. Hence the type of statute for proceeding against a juvenile as an adult in the first instance. Laws 1978, ch. 231, § 2 (declared void for vagueness in *State ex rel. Coats v. Johnson,* Okl.Cr., 597 P.2d 328 (1979); and H.B. 1493, effective October 1, 1979.

2. The Oklahoma Constitution uses the phrase "cruel or unusual punishment," Art. II, § 9. The petitioner bases an argument on the slight difference in wording, but for all intents and purposes we take these phrases to be identical.

Nor would the imposition of capital punishment be cruel in any of the ways mentioned by Justice Marshall. As Justice Stewart pointed out in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), capital punishment is not abhorred by public sentiment: In the four years between *Furman* and *Gregg* 35 states enacted statutes providing for the death penalty for some crime. And in California the people adopted an amendment to that state's constitution authorizing the death penalty. (This action effectively superseded the ruling of the California Supreme Court, which had ruled that capital punishment violated the state constitution.) Nor will the manner of execution cause extreme physical pain and suffering. The Oklahoma Legislature has provided for a means of execution which will minimize pain–22 O.S.Supp.1978, § 1014. Finally, the question of excessiveness can only be determined in the context of the particular crime. We shall turn to this subject next.

In light of the above discussion, we are of the opinion that it will not constitute cruel and unusual punishment to impose the death penalty on the petitioner.

### III

The remaining assignment of error raised by the petitioner is that the trial court erred in imposing the death sentence in this case. His arguments are directed against the Bill of Particulars filed by the State and the ruling of the court; and treatment of the assignment calls for a full review of the evidence presented regarding punishment. For that reason we have combined our discussion of this assignment with the statutorily required review of the punishment.

The Bill of Particulars filed by the State in this case alleged three of the aggravating circumstances specified by 21 O.S.Supp. 1978, § 701.12:

\* That the murder was "especially heinous, atrocious, or cruel";

\* That the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution."

\* That the petitioner would "constitute a continuing threat to society."

The trial court found that all three circumstances were established beyond a reasonable doubt. On the other hand, the only mitigating circumstance the court found was the youth of the petitioner. In balancing these factors, the judge indicated that he had given great weight to the petitioner's youth, but, nevertheless, believed that the death penalty was proper in this case.

The petitioner raises three arguments in his assignment of error. He contends that his motion to strike the Bill of Particulars should have been sustained because the facts alleged did not support the aggravating circumstance claimed to exist. He also contends that the evidence presented at the hearing failed to establish the aggravating circumstances beyond a reasonable doubt. And, third, he argues that the aggravating circumstances were outweighed by mitigating factors, so that the death penalty should not have been imposed. Instead of addressing these arguments individually, we shall address the aggravating circumstances individually, taking into consideration all the arguments presented.

### A

The petitioner asserts that the murder of Patrolman Crabtree was no more heinous, atrocious and cruel than every murder. The aggravating circumstance in the statute is for murders that are *especially* heinous, atrocious and cruel, and obviously the Legislature must have intended to reach killings which are "out of the ordinary."

In *State v. Dixon*, 283 So.2d 1 (Fla.1973), the Florida Supreme Court considered the meaning of the phrase in question:

"[W]e feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter

indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies–the conscienceless or pitiless crime which is unnecessarily torturous to the victim."

See also *Tedder v. State*, 322 So.2d 908 (Fla.1975).

■ The State's position–in the Bill of Particulars, at the sentencing hearing and on appeal–is that the identity of the victim and the manner in which the killing was done make this murder especially abhorrent. A review of the testimony makes it clear that Patrolman Crabtree thought he was making an ordinary traffic stop. In addition to the passengers in the petitioner's car, Highway Patrol Officer Joe Inman saw the traffic stop taking place. He was going the opposite direction on the turnpike and stopped in the median long enough to signal to Patrolman Crabtree to meet him for a cup of coffee. From his observation of the situation, he concluded that nothing out of the ordinary was happening; Patrolman Crabtree "was showing no signs of anything being wrong." Patrolman Inman drove away when he saw Patrolman Crabtree get out of his car and walk toward the petitioner's car.

Law enforcement officers perform a vital function in our society, and highway patrol officers do much more than just give traffic tickets. They give aid to travelers in distress, they render assistance in time of natural disaster. There are times when an officer expects danger: He recognizes the nature of the situation in which he has been placed and he prepares for it. But Patrolman Crabtree was not prepared for danger. Indeed, he had no reason to expect it. We believe that this killing of a peace officer in the performance of his duties was, in the words of the Florida Court, "extremely wicked" and "shockingly evil," and "outrageously wicked and vile." [3] And from the

testimony regarding the petitioner's manner, we believe that this killing was "designed to inflict a high degree of pain with utter indifference to . . . the suffering of others." *State v. Dixon*, supra.

We, accordingly, uphold the trial court's finding of the first aggravating circumstance alleged by the State.

### B

■ With regard to the second allegation, the petitioner claims that the Bill of Particulars was fatally defective because it failed to specify the offense for which the petitioner was being stopped. He also argues, as noted previously, that the stop was not a lawful arrest because Patrolman Crabtree did not see the incident at the service station. The State counters that the petitioner's automobile had no rear fenders, in violation of 47 O.S. 1971, § 12–405(j), and that Patrolman Crabtree could have been stopping the petitioner for that reason. Therefore, says the State, it is immaterial whether or not the officer saw the earlier event.

We are not persuaded by the State's argument, which is built entirely on speculation as to what Patrolman Crabtree *might have been* thinking at the time. But neither do we find merit in the petitioner's argument, for the same reason. The officer *could have been* making an illegal arrest based on a misdemeanor he did not see; but as the petitioner admits, the stop was not made for several miles: perhaps while driving behind the petitioner the officer observed some other violation.

The point is that we have no way of knowing. The only person who could testify to the reasons for making the stop is Patrolman Crabtree, and he is dead. We are not willing to presume, as the petitioner asks us to do, that the officer was acting illegally. *Stout v. State*, 90 Okl.Cr. 360, 214 P.2d 271 (1950); *Payne v. State*, Okl.Cr., 276 P.2d 784 (1954).

---

**3.** The statutes of Florida, Texas and Georgia all provide that the killing of a law enforcement

officer in the performance of his duties is in itself an aggravating circumstance.

■ It is important to realize that the focus of this aggravating circumstance is on the state of mind of the murderer rather than the officer. It is the murderer who must have the purpose "of avoiding or preventing a lawful arrest or prosecution." Section 701.12, supra. The trial court clearly realized this when making its finding:

> "[T]he Court finds without any question from the testimony that this Defendant did not want to go back to the authorities in Missouri, or be returned to his father or mother. Or at least to be returned to the person who was at that time charged with his supervision. And there isn't any doubt in the Court's mind but that beyond a reasonable doubt the crime was committed at that particular time to avoid prosecution."

We affirm the trial court's finding. It does not matter why the patrolman stopped the car; what matters is why the petitioner behaved as he did. And the facts of the case fully support the conclusion that he shot Patrolman Crabtree to avoid being returned to Missouri.

**C**

■ We also affirm the third finding by the trial court. The petitioner had an extensive juvenile record in Missouri, involving crimes against persons as well as against property. In addition, while in custody after the shooting, he made threats against the lives of other highway patrol troopers. Here again, the court's finding was justified by the facts presented to it.

**D**

■ We come now to the question of mitigating factors. At the sentencing hearing, the petitioner presented four witnesses: A social worker from Missouri and, as noted above, three expert witnesses. The social worker testified extensively concerning the petitioner's past and his family situation. The State psychologist testified that the petitioner was admitted to Eastern State Hospital for observation and examination during the certification proceedings. The other two witnesses—the psychiatrist in private practice and the sociologist on the faculty at Oral Roberts University—interviewed the petitioner before the certification proceedings. Their testimony at the instant sentencing hearing was substantially the same as that given at the certification hearing.

On the basis of the tests he had administered to the petitioner and his conversations with the youth, the State psychologist diagnosed the petitioner as a sociopathic or anti–social personality. At the certification hearing, the doctor said that two states—California and Maryland—had programs for treating sociopathic personalities, but that there was no way to be certain whether the treatment had an effect or whether people just grew out of their sociopathy. He admitted that some people—perhaps 30%—do seem to grow out of it as they get older, but he said at the sentencing hearing that this was limited principally to con–artist type persons rather than violently aggressive persons. (And he referred to a specific study in which nine out of 255 anti–social subjects were considered to have been successfully treated.) The doctor also stated that he found no indications of defective reasoning ability or mental illness.

The sociologist from Oral Roberts University had extensive experience in the field of criminal law. He also diagnosed the petitioner as an anti–social personality, and he talked about the factors in the petitioner's life which had led to this development. He believed that the petitioner could be helped with therapy to work through his problems and take a useful place in society, given a sufficient length of time.

The diagnosis of an anti–social disorder was repeated by the psychiatrist in private practice. This doctor, too, believed the petitioner could be treated, but estimated it would take 15 to 20 years of intensive therapy (although he had said three years at the certification hearing). He believed that at the time the petitioner pulled the trigger he was disassociating: in his opinion the petitioner was not shooting an Oklahoma Highway Patrol Officer, but was killing the specter of his stepfather, who was a police-

man in Missouri. Nevertheless, the doctor thought the petitioner knew the difference between right and wrong—the petitioner just did not think the rules applied to him. On the other hand, the doctor did not believe the petitioner would kill again if the opportunity ever arose.

In his closing argument to the District Court and in his brief and argument to this Court, the petitioner's attorney urged several mitigating circumstances. However, the trial court found only one—the petitioner's youth. As stated earlier, the District Court indicated great weight had been given to this factor but, nevertheless, found it could not overbalance the aggravating circumstances of the case. We, too, have given serious consideration to the petitioner's youth. But the aggravating circumstances in this case are very serious; and we, too, have to conclude that the petitioner's youth cannot outweigh them.

 The petitioner also argues his mental state at the time of the murder. He stresses his family history in saying he was suffering from severe psychological and emotional disorders, and that the killing was in actuality an inevitable product of the way he was raised. There is no doubt that the petitioner has a personality disorder. But all the evidence tends to show that he knew the difference between right and wrong at the time he pulled the trigger, and that is the test of criminal responsibility in this State. *Gonzales v. State*, Okl.Cr., 388 P.2d 312 (1964). For the same reason, the petitioner's family history is useful in explaining why he behaved the way he did, but it does not excuse his behavior.

## IV

 In addition to ruling on the assignments of error that are raised, 21 O.S. Supp.1978, § 701.13, ¶ C, requires this Court to make three determinations. We have examined the record in this case and have given careful consideration to the arguments of counsel, both written in the briefs and presented at oral argument, and we hold:

1. That the sentence of death was not imposed "under the influence of passion, prejudice, or any other arbitrary factor." Section 701.13, ¶ C, 1. This was a notorious killing. The record indicates that Patrolman Crabtree was a resident of the county and, no doubt, public feeling was high. But the transcripts are completely devoid of the kinds of remarks that reveal bias, and we are sure that the judge in this case gave the petitioner a fair and impartial hearing.

2. That the evidence does support the judge's finding of statutory aggravating circumstances as enumerated in Section 701.12. The basis for this holding should be clear from the body of this opinion.

3. That the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. This holding, too, finds ample support in our opinion.

Title 21 O.S.Supp.1978, § 701.13, ¶ E, provides:

"The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

"1. Affirm the sentence of death; or

"2. Set the sentence aside and remand the case for modification of the sentence to imprisonment for life."

This conviction wherein the death penalty was assessed places this Court in the same position that confronted the Supreme Court of South Carolina in *State v. Shaw*, 255 S.E.2d 799, 807 (S.C.1979), wherein that Court stated:

"We have compared the death sentences imposed upon appellants with the sentences imposed in all prior capital cases tried under the current death penalty statutes and are satisfied that there are no similar cases against which the proportionality of the sentences imposed upon appellants can be measured.

"The inability of this Court to compare this case with any other similar cases does not require, however, that appellants' sentences be set aside. Any system of review that requires a comparison of each case with all similar prior cases must have a beginning. There will be a first case for each type or category of capital case that may appear and that first case necessarily cannot be compared to any other similar cases. The first case must stand alone, otherwise comparative sentence review would be forever impossible." (Footnote omitted)

An attempt has been made to compare this case with prior cases that were tried and reviewed under death penalty statutes that are definitionally different from the current statutes. Hence, we find those cases provide no basis for meaningful sentence review.[4]

The current death penalty statutes comply with the guidelines set out in *Gregg*. We have considered and overruled each assignment of error by the petitioner and have completed the statutorily mandated sentence review. We have searched the record for any fundamental error that might have prejudiced the petitioner and have found none. We find no other reason to disturb or modify petitioner's death sentence.

The judgment of guilt and the sentence of death are *AFFIRMED*.

CORNISH, P. J., concurs.

BUSSEY, J., concurs specially.

BUSSEY, Judge, concurring:

For the reasons and in accordance with the authorities cited by my colleague J. Brett, I am of the opinion that the judgment and sentence should be affirmed. Appellant's contention that the State suppressed evidence critical to the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is not supported by the record, for it is clear that counsel for Appellant was not deprived of producing such evidence but did in fact make the following stipulation during the mitigation–aggravation hearing:

"MR. BAKER: Yes, Your Honor. I apologize for the delay. We finally contacted Mr. Jim Dickey at work. We are now able to make the following stipulation regarding what his testimony would be were he here to testify today in person.

"And that would be that he observed the Volkswagen in question leave the Howard Johnson Filling Station in the manner that the other witnesses have described, going off the road; that he then went in and informed Trooper Crabtree, who was drinking coffee in the restaurant, of what he had seen; whereas Trooper Crabtree responded: I will check it out." [Tr. 270–271 Hearing of May 15, 1978]

Appellant's further contention that the arrest was unlawful by reason of it having been made for a traffic violation not committed in the trooper's presence is likewise without merit. The State's photograph No. 2 of the Volkswagen appearing at Transcript page 5, certification hearing of June 14, 1977, and State's Exhibit No. 13 admitted by stipulation during the aggravation–mitigation hearing of May 15, 1978, Transcript page 32–33, were both photographs of

4. A list of cases with which an attempt to compare is: *Manuel v. State*, Okl.Cr., 560 P.2d 1008 (1977); *Clark v. State*, Okl.Cr., 558 P.2d 674 (1977); *Strange v. State*, Okl.Cr., 462 P.2d 292 (1969); *Fesmire v. State*, Okl.Cr., 456 P.2d 573 (1969); *French v. State*, Okl.Cr., 416 P.2d 171 (1966); *Dare v. State*, Okl.Cr., 378 P.2d 339 (1963); *Doggett v. State*, Okl.Cr., 371 P.2d 523 (1962); *Young v. State*, Okl.Cr., 357 P.2d 562 (1960); *Spence v. State*, Okl.Cr., 353 P.2d 1114 (1960); *Williams v. State*, Okl.Cr., 321 P.2d 990 (1958); *Williams v. Oklahoma*, aff'd 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516; *rehearing denied*, 359 U.S. 956, 79 S.Ct. 737, 3 L.Ed.2d 763 (1959); *Klettke v. State*, 92 Okl.Cr. 366, 223 P.2d 787 (1950).

**1172**

the Volkswagen driven by Appellant at the time of the murder. These clearly demonstrate that the Volkswagen did not have rear fenders or mud flaps and were therefore in violation of 47 O.S.1971 § 12–405(j)[1], punishable under the provisions of 47 O.S. 1971, § 17–101.

Trooper Crabtree followed Appellant's vehicle in the daylight hours and had ample opportunity to observe the violation. This evidence alone is sufficient to support the legality of the stop.

[1] "(j) All trucks, trailers, and other vehicles operating on the highways, except animal–drawn vehicles, not equipped with fenders over the rearmost wheels shall have attached thereto a rubber or fabric apron directly in rear of the rearmost wheels, and hanging perpendicular from the body of the vehicle. Said apron shall be of such a size as to prevent the bulk of the spray or other substances picked up from the roadway from being thrown on the windshield of a following vehicle and thereby obscuring the vision through the windshield of the driver of said vehicle. The provisions of this subsection shall not apply to a farm tractor moving over the state highway system at a speed less than twenty (20) miles per hour."