## BOB WALKER v. STATE.

No. A-1797.     Opinion Filed March 28, 1914.

(139 Pac. 711.)

1. **HOMICIDE—Principals and Accessories.** One who is present, aiding and abetting in a murder, is guilty as a principal, though another does the killing.

2. **WITNESSES — List of Witnesses — Disqualification of Witness.** Under section 20, Bill of Rights, the defendant in a capital case has a constitutional right to be furnished with a list of the witnesses that will be called in chief to prove the allegations of the indictment or information, together with their post-office addresses; such list to be furnished at least two days before the case is called for trial. In the instant case, held, that the failure of the state to give the Christian name of a witness in the list of witnesses furnished did not disqualify such witness from testifying, because it affirmatively appears from the record that the defendant was not misled to his prejudice by reason of such omission.

3. **CRIMINAL LAW—Constitutional Right—Waiver.** Where a constitutional right is largely for the benefit of the defendant, and in the nature of a personal privilege, the law is well settled that the defendant may waive such right.

*Appeal from District Court, Creek County;*
*Wade S. Stanfield, Judge.*

Bob Walker was convicted of murder, and appeals. Affirmed.

Plaintiff in error, Bob Walker, herein referred to as the defendant, was by information charged with having killed Fred Evans, at Mannford, Creek county, Okla., on the 2d day of December, 1911. Upon his trial he was found guilty of murder, and his punishment assessed at imprisonment in the penitentiary for life. Judgment and sentence was rendered on the 10th day of February, 1912.

The evidence shows that the defendant, Bob Walker, and his brother, Bud Walker, went to work, picking cotton, for Joe Hayes on the 20th day of October, 1911, and lived in a tent in the yard of his house, two miles south and a quarter of a mile

west of Mannford, until the 2d day of December, that year. About the hour of 7 o'clock, in the evening of that day, J. R. McDaniels was driving home from Mannford in a farm wagon. His son-in-law, Howard Walker, was with him. About two miles south of Mannford, Bud Walker climbed into the wagon, and after riding a short distance held a six-shooter on them and told them to throw up their hands. The defendant then appeared and climbed into the wagon and searched their clothes, taking a watch and a pocketknife from McDaniels, who had dropped his pocketbook, and taking a watch and two pocketknives from Howard Walker. McDaniels stopped at the next house and gave the alarm by telephone. He borrowed a gun and returned to Mannford, and the town marshal with a posse started out to capture the highwaymen. Two negroes were seen on the road near the stockyards; a member of the posse called upon them to halt, and this command was repeated by two or three others. The negroes both fired upon the posse, one emptying his gun and the other firing two or three shots; one striking Fred Evans, the deceased, above the eye, killing him instantly. One of the negroes ran northeast and the other east. Bud Walker was captured and lynched that night. The defendant was arrested at Claremore the next day. McDaniels' watch and four pocketknives and 30 cartridges were found on his person.

The testimony for the state was substantially as follows:

Earl E. Ellsworth testified that he lived at Enid, and was a fireman on the Frisco between Enid and Tulsa; that while his engine was near the east end of the yards at Mannford, about 8 p. m., December 2d, a couple of negroes got on the back end of the engine tank, each carrying a pistol in his hand. A crowd of men were coming down the track, and the negroes jumped off and started down a nearby road; some one called on them to halt, and the negroes commenced to shoot at the crowd; that the second shot from the shortest negro killed a white man; that no shot was fired by any person in the crowd until the man was killed; that then they all began to shoot; that both negroes wore stiff hats and three-quarter length overcoats.

B. J. Chronic testified that he was a banker at Mannford; that the town marshal, Rider Bruner, directed him, with others, to look over a freight train that was in the yards for the two negroes that had held up Mr. McDaniels that evening; they found a negro in a coal car, but that he was not one of those that they were looking for; that it was a bright moonlight night, and they saw two negroes coming down the road; that he called on them to stop, and they opened fire and both shot at the posse before any person shot at them; that he was standing near Fred Evans when he fell dead almost at his feet.

Willie Mann testified that he was present when Fred Evans was shot and saw him fall; that both negroes were shooting when he fell; that the negroes then parted, one going north and the other east.

R. C. Poulter testified that he was loading cotton that evening, and was called on to help arrest a couple of negroes; that the two negroes ran out from the freight train, and some one of the party called on them to halt, and the negroes opened fire; that they were standing two or three feet apart when they fired the shots; that the short negro fired one shot and Fred Evans fell; that when they separated the short negro went north and the other down the road; that he found a Colts 32 on a 45 frame at the side of the road, near where the negroes were when they separated; it had six empty shells.

W. E. Gage testified that he was present when Fred Evans was killed, and after the shooting tracked the negro that went north and covered some of the tracks with brush; that the next morning Mr. Berry and other parties brought a couple of bloodhounds and they put them on the tracks that he had covered. The bloodhounds followed the tracks about a mile; they went almost in a circle back to the railroad. In following the tracks they found an overcoat with the right elbow torn out.

Claud Evans testified that he was a brother of the deceased, and was present when his brother was killed; that he saw the defendant, with another negro, about an hour before, a mile and a half south of Mannford; that the other negro was the tallest of the two; that about fifteen minutes later he met McDaniels and

went with him in pursuit of the negroes; that he was standing within five feet of his brother when the latter fell, and the negroes were in the road about twenty steps from him; that the defendant shot at the time his brother fell; that he then began shooting, and the negroes started to run, the defendant going northeast.

E. S. Plank testified that he was a policeman at Claremore and arrested the defendant on Sunday afternoon, December 3d, in Claremore, and took from him an Elgin watch, four pocketknives, and some 30 cartridges; that the defendant did not have an overcoat, but was wearing a stiff hat.

J. R. McDaniels, as a witness, identified this watch as the one that was taken from him by the defendant when he was robbed, and identified one of the pocketknives as one that was taken from him.

Howard Walker identified one of the pocketknives that had the name "Corb Moore" engraved upon it as one that was taken from him by the defendant when he robbed witness on the highway.

Joe Hayes, as a witness, identified the gun that was found near the road as one that the defendant's brother kept in his house while he was picking cotton for him.

The defendant, Bob Walker, as a witness in his own behalf, testified: That his home was at Daingerfield, Tex. That he and his brother went to work picking cotton for Joe Hayes. That the gun found where the shooting occurred was his brother's gun. That on Saturday evening they started for Mannford, intending to go from there to Wagoner. That when they got about halfway to Mannford they heard a wagon coming, and his brother told him to turn around and go back, "and I said it would be bad luck to turn back, and he said, 'Go on and say nothing.'" That he was going to get into the wagon. That when he had gone about 100 yards he heard some one say, "Whoa," and his brother called him. That his brother had two men in the wagon holding their hands up, and he said to him, "Get in and go through them." His brother stood behind the seat and held the gun, and after he went through them he and his brother got out of the wagon and started straight up through the

woods; after going two or three miles they came to the train track, and his brother said: "You lay down; I am going uptown, up where that freight train is standing, to see if I can find an open car, and I will be back directly." That in about 30 minutes he came back, and said, "I met a fellow up there I seen in Kansas City; I used to run with him; he was my partner, and he is going the same way, and when the train comes by you catch it"— and "I told him I could not catch the train with this overcoat, and he said, 'Give me the overcoat,' and he took the overcoat with him, and said, 'When you see us coming, get ready to catch the train.'" That when his brother went back he lay down on the side of the railroad. That "the next he saw them coming down the road," and the shooting commenced, and he ran into the woods and kept on until he got to the river and then followed the river, walking all the way to West Tulsa, and there got on the train and went to Claremore.

*Pryor, Rockwood & Lively,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). The assignments of error relied upon for the reversal of this judgment are based on exceptions to rulings in receiving and rejecting evidence. A careful examination of the record leads to the conclusion that the only error assigned which we cannot disregard as merely technical and without substantial merit is the first, that the court erred in permitting the state's witness Earl E. Ellsworth to testify without service of written notice at least two days before the trial. The record shows that on February 5, Earl E. Ellsworth was sworn and called as the first witness for the state. After stating his name, age, and residence, the defendant objected to his being allowed to further testify "for the reason that his name was not indorsed upon the information as required by law, and that no notice has been served upon the defendant that this witness would be produced as a witness against him." Thereupon the county attorney introduced a copy of a notice, which, omitting title, reads as follows:

"NOTICE.

"To Bob Walker, Defendant:

"You are hereby notified that the above-styled case in which you are the defendant has been set for trial on the 30th day of January, 1912, at nine o'clock a. m. at the courthouse in Sapulpa, Oklahoma, and that the following is part of a list of the witnesses that will be called in chief to prove the allegations of the information filed against you, together with their post-office addresses:

| Name of Witnesses. | Post Office Address. |
| --- | --- |
| Elsworth whose first name is unknown to me. | Enid, Oklahoma. |
| Jim Hayes. | Mannford, Oklahoma. |
| J. J. Horn. | Mannford, Oklahoma. |

"Dated at Sapulpa, Oklahoma, this 25th day of January, 1912.

"VICK S. DECKER, County Attorney.
"By ROY T. WILDMAN, Dep. Co. Atty."

Indorsements:

"1197. State v. Bob Walker. Received and filed this 27 of Jan., 1912.

"J. B. SUMMERS, District Clerk.

"Received this notice on 25th day of January, 1912, served same on Bob Walker in person on 25 day of January, 1912, by delivering him a true copy.

"J. W. BERRY, Sheriff, Creek County,
"By J. H. TOWNSEND, Deputy."

Also a subpoena issued on the defendant's praecipe for Earl E. Ellsworth, which subpoena shows that it was served by the sheriff on the 2d day of February, 1912. Thereupon the defendant's objection was overruled by the court. The objection is founded on section 20 of the Bill of Rights, which provides, among other things, that:

"In capital cases, at least two days before the case is called for trial, he shall be furnished with a list of the witnesses that will be called in chief to prove the allegations of the indictment or information, together with their post-office addresses."

This constitutional provision is mandatory, and preserves an important right to a defendant in a capital case. Its pur-

pose is to enable him to inquire into the testimony that he will be called on to meet, and to enable him to prepare for his defense.

Where a constitutional right is largely for the benefit of the accused, or in the nature of a personal privilege, the law is well settled that an accused may waive such right. *Blair v. State,* 4 Okla. Cr. 359, 111 Pac. 1003; *Starr v. State,* 5 Okla. Cr. 440, 115 Pac. 356; *Stouse et al. v. State,* 6 Okla. Cr. 415, 119 Pac. 271.

Says Mr. Bishop:

"Any right given by statute or otherwise to the defendant for his benefit, such as to have a copy of the indictment, or a list of the jurors, or of the witnesses against him, at a particular time, or before trial, may be waived, either in words or by omitting to apply for the thing. And if, for example, the copy of the indictment furnished him is incomplete, he cannot first object after trial." (Bishop's New Crim. Proc. par. 126.)

In the case of *Logan v. United States,* 144 U. S. 263-304, 12 Sup. Ct. 617, 630 (36 L. Ed. 429), it is said:

"The defendant, if indicted for treason, is to have delivered to him three days before the trial 'a copy of the indictment, and a list of the jury, and of the witnesses to be produced on the trial for proving the indictment;' and if indicted for any other capital offense, is to have 'such copy of the indictment and list of the jurors and witnesses' two days before the trial. The list of witnesses required to be delivered to the defendant is not a list of the witnesses on whose testimony the indictment has been found, or whose names are indorsed on the indictment; but it is a list of the 'witnesses to be produced on the trial for proving the indictment.' The provision is not directory only, but mandatory to the government; and its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense. Being enacted for his benefit, he may doubtless waive it, if he pleases; but he has a right to insist upon it, and if he seasonably does so, the trial cannot lawfully proceed until the requirement has been complied with. *United States v. Stewart,* 2 U. S. (2 Dall.) 343, 1 L. Ed. 408; *United States v. Curtis,* 4 Mason, 232; *United States v. Dow,* Taney, 34 [Fed. Cas. No. 14990]; *Reg. v. Frost,* 9 Car. & P. 129; 2 Mood. C. C. 140; *Lord v. State,* 18 N. H.

173; *People v. Hall,* 48 Mich. 482, 487 [12 N. W. 665, 42 Am. Rep. 477]; *Keener v. State,* 18 Ga. 194, 218 [63 Am. Dec. 269]."

And in *Hickory v. U. S.,* 151 U. S. 303, 14 Sup. Ct. 334, 38 L. Ed. 170, it is held that the benefits of this statute may be waived expressly or impliedly by failure to make seasonable objection.

It clearly appears from the record that the defendant had written notice as early as January 25, 1912, that a man by the name of Ellsworth, whose post-office address was Enid, Okla., would be used in chief by the state, and that the first name of such witness was unknown at that time to the county attorney. There was no showing that the county attorney had any fuller knowledge of the witness' name than that contained in the notice served, nor showing of any attempt on his part to conceal the identity of this witness, and no objection to the list as served upon the defendant was made before entering upon the trial, nor did he ask for continuance because of the uncertainty of the name of this witness, and in this connection it will be observed that the defendant had caused a subpoena to be served upon the same witness to testify in his behalf. So that it clearly appears that the defendant not only had ample notice of the identity of the witness, but that he was acquainted with what his testimony would be, to such an extent that he caused said witness to be subpoenaed in his own behalf.

We cannot give our consent to a construction of the constitutional provision that would necessitate a reversal of the judgment from the record in this case. It is sufficient to say that where it affirmatively appears that the defendant has not been misled to his prejudice by the omission of the given name of a witness, whose surname and post-office address appeared upon the list furnished to the defendant, he is not entitled to a reversal because the testimony of such witness has been received.

The court very fully and fairly instructed the jury as to all questions of law arising in the case.

The only controverted question is as to whether the defendant was present and participated in the shooting. The testi-

mony of all the witnesses, except the defendant, is that he was present at the time of the homicide, aiding and assisting in it. One who is present, aiding and abetting in a murder, is guilty as a principal; though another does the killing.

We are not favorably impressed with the defendant's testimony in which he attempts to prove an alibi.

A careful examination of the record leads us to the conclusion that the only debatable question in the case for the jury to consider was whether the defendant's punishment should be death or imprisonment for life. Having been unable to find any material error in the proceedings in this case, the judgment of conviction will be affirmed.

ARMSTRONG, P. J., and FURMAN, J., concur.