James SPENCE, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12844.

Court of Criminal Appeals of Oklahoma.

June 29, 1960.

John W. Tyree, Lawton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., Warren H. Crane, Co. Atty., Comanche Co., Lawton, for defendant in error.

BRETT, Judge.

This is an appeal by James Spence from a second conviction for the murder of Ruth Zimmerman, committed in Comanche County, Oklahoma on March 31, 1958. The case was originally brought by information against Spence and Eddie Oxendine as accomplices on which a trial was held in the District Court of Comanche County, Oklahoma. A conviction was obtained affixing the death penalty. From that conviction an appeal was taken in which we reversed and remanded the case for a new trial. Oxendine and Spence v. State, Okl.Cr., 335 P.2d 940. Thereafter the defendants applied for a severance which was granted. Spence sought a change of venue, which was granted and the case was remanded for trial, as to him, to Cotton County, Oklahoma. Spence was again tried in the District Court of that county and convicted, with the imposition of the death sentence. From that conviction, judgment and sentence, this appeal has been perfected.

The facts as developed at this trial by Spence's written confession and other corroborative evidence disclosed that James Spence, his brother-in-law, Eddie Oxendine, together with their wives, Leacy Spence and Donnie Oxendine, were traveling from Kingston, North Carolina to obtain work. They arrived in Lawton, Oklahoma about March 25, 1958. On March 31, 1958, Spence and Oxendine left their wives at the apartments where they were staying and went on a ride around town, stopping at about three places to drink beer. Sometime after 10 P.M. they approached an army surplus store known as Surplus City of which Reggie N. Zimmerman was assistant manager. Zimmerman, his wife, and infant child lived in the apartment above the store. Spence and Oxendine observed Zimmerman as he came out of the store and went up the stairs to the apartment. Spence said he told Oxendine "that man

ought to have some money", to which Oxendine responded "yes, we are running short". The record discloses that prior to this incident, and in apparent preparation therefor, Oxendine had purchased two .25 automatic pistols from a Lawton Pawn Shop, with which both men were armed. They stopped their car and Oxendine, alone, went to the apartment, representing to Zimmerman through a closed door that he needed help to repair a flat tire. Zimmerman opened the door and Oxendine stuck his pistol in Zimmerman's face with instructions that he step back. Zimmerman asked that he go away, stating, "you are going to get in a whole lot of trouble here". Instead of heeding that wise admonition Oxendine went into the apartment, and then cracked open the door and smiled at Spence, who immediately came up the stairs and into the apartment. Spence also had his gun and said, "we want the money". Zimmerman informed him that he didn't have the money. Spence then told Zimmerman "we know where it is and you are going to get it." Spence then instructed Oxendine to go down stairs to the store with Zimmerman to get the money. Spence informed Zimmerman that "if you try anything I'll plug your old lady and I'll come and get you." Oxendine went downstairs with Zimmerman, who turned on the light, but was told to turn it off. Then in the office where the safe was located, with the aid of light from a burning waste paper torch, Zimmerman opened the safe, sacked up the money, gave it to Oxendine, and together he and Oxendine returned upstairs. Spence and Oxendine then tied Zimmerman and his wife putting a towel around their mouths, notwithstanding their plea that they needed to take care of their baby which was 4 months and 10 days old. Spence and Oxendine then put Zimmerman and his wife in a back bedroom closet, as Spence said, "so that they couldn't identify them." They closed the door as if leaving, then suddenly stopped outside the door holding a hushed conversation which Zimmerman could not understand. Spence said in his

confession that he got scared (no doubt he was frightened from fear of identification, and that is probably what the hushed conversation was about), and he told Oxendine to open the door, whereupon, Spence emptied his gun, firing into the helpless bodies of Mr. and Mrs. Zimmerman.

The record discloses that Ruth Zimmerman was shot three times and was killed instantly by a bullet that penetrated completely through the heart. Zimmerman was shot four times, three in the arm and once in the chest. The next day Spence and Oxendine left Lawton and were apprehended in Albuquerque, New Mexico. It was there that Spence confessed his participation in the crime, the delineation of which we have related herein substantially from his written confession, which bore his signature and was witnessed by his wife, Oxendine, and two New Mexico police officers. All of what he said in that confession was corroborated in substance by Mr. Zimmerman, who survived the fusillade of bullets. Had he not lived then Spence and Oxendine might now be preying on society in the manner of tooth and claw, for there was no other means of identification other than the survival of one of the Zimmermans. Seldom are we called upon to review a record revealing a more calloused calculated crime than this one. It is apparent that these helpless people were shot in order to close their eyes and shut their mouths in death to avoid identification of the killers later. The hushed conversation after the Zimmermans were bound and gagged in the closet was the counsel which decreed their doom, but providence refused to close the case, in Mr. Zimmerman's survival.

The killers further aided providence in the confirmation of their crime, for when Spence and Oxendine were arrested they were still in possession of the automatic pistols, and the money taken in the robbery. Bullets found on the floor of the closet and empty cartridge cases on the floor of the room were established by a ballistic expert as having been fired from the pistol identified by Spence as the one he shot during

the fatal occasion. The evidence disclosed that this was one of the guns that a Lawton pawnbroker sold to Eddie Oxendine, alias Don Locklear. It thus becomes apparent that these guns were purchased with premeditated design, to be used other than as instruments of protection. Hence, the use of the alias. If they had been purchased for other purposes an alias would not have been employed.

The keys to the Surplus City entrance doors were found in a pillow slip in the attic of the adjoining apartments occupied by Spence and Oxendine and their families on the night of the killing. The foregoing substantially constitutes the facts of the State's case. The defendant demurred to the evidence, rested and offered no evidence in his behalf.

██ Among other things the defendant complains of certain evidence given by one of the State's witnesses that Oxendine did most of the talking in Albuquerque and that Spence verified what he said. Counsel for defendant then said he wished to know what Spence verified, and the answer was, "Oxendine stated that Spence did the shooting and Spence verified this." In face of the written confession signed by Spence, admitting the fact, this contention is wholly without merit. This is so apparent that no authority was cited to sustain it.

██ Next, the defendant objects to introduction of the Oxendine gun in evidence. There are several grounds upon which the introduction of this evidence can be sustained. For an extensive treatment of this question see 22 C.J.S. Criminal Law § 712, p. 1207:

> "Weapons, bullets, tools, instruments, or other articles used, or respecting which there is sufficient evidence to justify a reasonable inference that they were or may have been used and that such weapons, bullets, tools, instruments, or other articles were or may have been used by the accused or his co-actors."

See also 77 C.J.S. Robbery § 46, p. 493, note 34. People v. Cotton, 117 Cal.App. 469,

4 P.2d 247. In this instance it was part of the res gestae and one of the instruments used conjointly by the defendant and his accomplice. Brannon v. State, 39 Okl.Cr. 207, 264 P. 835:

> "Where there is evidence tending to prove a conspiracy between defendant and others in the commission of the crime charged, and the defendant and such others soon after the commission of the crime are found together and arrested under circumstances tending to prove that the crime charged was committed by them jointly, weapons or other things connected with the crime charged found on the persons with defendant, are admissible against him."

State v. Parr, 296 Mo. 406, 246 S.W. 903; People v. Green, 13 Cal.2d 37, 87 P.2d 821. Clearly the Oxendine gun was admissible as part of the transaction itself, essential to its explanation, as was Spence's gun and the keys found in the pillow case.

██ Next, the defendant complains of the introduction into evidence of a copy of the "Lawton Morning Press" headline dated April 1, 1958. The headline admittedly read, "Woman Slain In Holdup of Store." This copy of the Morning Press with the account of the killing was found on the dresser in the apartment occupied by Spence, et al., which apartment was hurriedly vacated with almost a month's paid-up unexpired rent available to defendant. Only the headline was admitted and the story was excluded. Defendant contends that it was prejudicial. Under the record and the defendant's clear confession of guilt this contention is void of merit. It is apparent why no authority is cited to sustain this contention.

██ The defendant further complains that the trial court admitted evidence of a planned jail break while the perpetrators were awaiting trial. This is not error for the reason as has been repeatedly held that such evidence constitutes proof of consciousness of guilt, Commonwealth v. Green, 302 Mass. 547, 20 N.E.2d 417; State

v. Garrison, 147 Mo. 548, 49 S.W. 508; 22 C.J.S. Criminal Law § 631, p. 965 notes 79, 84, 89. And is admissible although the accused admits he is guilty of the crime with which he is charged.

Finally, the defendant complains that his confession was erroneously admitted in evidence for the reason that the state offered no proof that it was voluntarily made and proof that defendant was denied his constitutional rights was insufficient. This contention is wholly without foundation in the record. Officer Hartline, who took the confession, testified that he advised Spence that he did not have to tell anything, that what he said could be used against him, and that he could consult with an attorney if he so desired and that neither threats nor promises were used to obtain the statement. After the statement was prepared by dictation, he read and signed the same as has hereinbefore been indicated, which itself recites that it was made "of my own free will without threat or promise" and that he was advised of his right to legal counsel and that the statement could be used against him. To its introduction the defendant made the foregoing objection, but at no time did he offer to prove to the contrary that the statement was unlawfully obtained. The burden was on him to so show, but this he did not assume to do. In Fischer v. State, 95 Okl.Cr. 189, 242 P.2d 463, this court said:

> "The mere fact that a confession is made to a police officer while the accused is under arrest, does not necessarily render the confession involuntary; but as one of the circumstances, may be taken into account in determining whether or not the statement was voluntary. * * * The burden is upon him who challenges the admissibility of a confession to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact."

To the same effect is Berry et al. v. State, 4 Okl.Cr. 202, 111 P. 676, 31 L.R.A.,N.S., 849. It thus appears that the asserted errors in this case are without substantial merit. The judgment and sentence is accordingly affirmed and execution of the same is set for August 31, 1960 by the warden of the Oklahoma State Penitentiary.

POWELL, P. J., concurs.

NIX, Judge.

I have carefully examined the record in this case and find no error of law upon which to base this Court's interference with the verdict of the jury.