**William H. HINDS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–73–125.**

Court of Criminal Appeals of Oklahoma.

Sept. 24, 1973.

Roy D. Moore, Lawton, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

Appellant, William H. Hinds, hereinafter referred to as defendant, and his co-defendant Bill Cherry, were conjointly charged, tried and convicted by a jury of the crime of Murder in the District Court of Comanche County, Oklahoma, Case No. CRF–72–511. The defendant's punishment was assessed at life imprisonment and from said judgment and sentence, the defendant has perfected his timely appeal.

The evidence adduced at trial reflects that Sgt. Al Jackson, a service man stationed at Fort Sill, was severely beaten on the evening of August 4, 1972, in Lawton, Oklahoma. Jackson subsequently died and his body was taken to Oklahoma City where an autopsy was performed.

Doctor Fred Jordan testified that he was an Assistant Chief Medical Examiner for the State of Oklahoma and that he performed an autopsy on Jackson's body. There was a large number of cuts over the head, multiple rib fractures and an extensive fracture of the skull. It was the doctor's opinion that the cause of death was a complication of the skull fracture and that the injury was caused by a relatively rounded object applied with extensive force.

Vera Cherry, the seventeen-year-old daughter of the co-defendant Cherry, then testified that on the day in question she was asked by her father to set up a meeting between Cherry and Jackson. The meeting was arranged for that evening at the home of Cherry's ex-wife, Vera's mother. At approximately 6:45 p. m., when Vera and Jackson were alone in the house and sitting around the kitchen table, Cherry came in, grabbed Jackson by the hair, pulled his head back and began to curse. Vera ran to her bedroom and shortly thereafter her boyfriend, Jackie Dubose, joined her. After Vera and Dubose had been in the bedroom for approximately fifteen minutes, they returned to the living room where Cherry was standing with blood on his T-shirt. The kitchen was covered with blood and police cars were next door where Jackson was being treated for head wounds.

Vera further testified that Cherry and her mother were divorced and that she was living with her mother and the younger Cherry children. Jackson and her mother had been dating and were planning on getting married. On cross-examination, Vera stated that she never saw any object in her father's hand and that the first recollection she had of the defendant being in the house was when he came back to the bedroom some fifteen minutes after Dubose joined her.

Jackie Dubose then testified that on the day in question he, Vera and Cherry went to a cafe where they had a conversation about Dubose and Vera getting married and about Al Jackson. A transaction was mentioned where Vera would be paid One Hundred Dollars ($100.00) for arranging a private meeting between Jackson and Cherry. Vera was subsequently dropped off close to her mother's home and Cherry and Dubose went to Wayne Dumond's trailer. Dubose was then instructed by Cherry to take his car and watch the Cherry home until Jackson got there. When Dubose returned to advise of Jackson's arrival, Cherry, the defendant, Dumond and Dubose got into the car and drove to within one-half block of the Cherry residence. Cherry got out of the car, walked around to the back of the car and then returned to the driver's seat and drove to the Cherry home. When they entered the home, Cherry grabbed Jackson by the hair and they began to scuffle. Vera screamed and went to the

bedroom and Dubose soon followed. Just as Vera left the kitchen, Dubose testified that he watched the defendant Hinds kneel down and strike Jackson, who was lying face down on the kitchen floor, once with a silver object extending approximately six inches past his hand.

On cross-examination, Dubose admitted that he had volunteered to testify for the State and that he was also charged with the murder but had been granted a severance without objection.

Sgt. Wayne Dumond then testified that he had been granted immunity in the case. He stated that when he got home at approximately 5:30 on the evening in question, Cherry, the defendant, and Dubose were there. Cherry stated that there had been a change in their earlier plans to run Jackson down while he was on his motorcycle. Dubose left to reconnoiter the Cherry home and then returned to state that Jackson was there. The four of them left in Cherry's car and drove to within one-half block of the home. Cherry got out of the car, went back to the trunk and returned with two socket wrench handles. Cherry handed one to the defendant and one to Dumond. When they arrived at the home, Cherry went straight to the kitchen and grabbed Jackson. Cherry got Jackson in a headlock and at that time the defendant came in and hit Jackson on the head with one of the wrench handles. Jackson fell to the floor and Cherry began to kick him. Dumond then joined Dubose and Vera in the bedroom for a while. When he returned, Cherry told him to go into the kitchen and "finish it off." At that time, Jackson was trying to get up off the floor and Cherry went back into the kitchen and began to beat Jackson about the head, neck and shoulder area with a hammer. Subsequently, Cherry and Jackson were struggling at the back door of the kitchen and Dumond admitted taking one of the wrench handles and hitting Jackson about the head or neck. Dumond slipped on the blood and Jackson ran out the back door. Under

cross-examination, Dumond stated that when Jackson came up off the floor, he had a wrench handle in his hand and that is when Cherry went for the hammer.

Mrs. Janie Mitchell then testified that she lived next door to the Cherry home and that at approximately 7:30 on the evening in question, a man pushed open her door, fell into her living room and asked for help. She asked the man what happened and he said that they were beating him with a hammer. She asked who beat him and he said "Bill Cherry." The policeman then asked if there were more than one and Jackson said that there were.

Larry Salmon, a Lawton police officer, then testified that he found Jackson lying on the floor bleeding profusely from the head. Jackson told him that Bill Cherry and two others had beat him. He could not identify the other two men. A broken hammer and two ratchet handles or breakover tools approximately eighteen inches long were found at the Cherry home.

Harry Ezell then testified that he was a Lawton police officer who was called to the scene and that Jackson told him that "Cherry did this to me; I hope you get him."

John Krantz then testified that he was stationed at Fort Sill and that on the third day of August he walked in on a conversation between the defendant, Dumond, and Cherry. During the conversation, Cherry asked Krantz if there was any way he could get somebody down to the dispatch shed. Krantz said, "Well, maybe his log books are messed up." Someone asked for Jackson's telephone number and Bill Hinds called him and asked him to come down and check over some log books.

Natalee Lefler, an Army WAC, then testified that on the 28th day of July 1972 she had an occasion to talk to the defendant at a local bar. He asked her if she was still going to do a favor for them. Earlier that day, Hinds and Cherry had called her and asked her if she could get some sort of drug to put in Jackson's drink to put him to sleep.

They stated that they wanted to drug him so they could take him to a hotel and take some pictures of him with some girls.

Sgt. Ronald E. Jean then testified that on the 24th day of July the defendant told him that Jackson and he had been in an argument, that Jackson threatened to whip him with a pool stick and that he wanted to kill Sgt. Jackson. Under cross-examination, Jean stated that he knew Hinds and that he did not think that the defendant meant what he said, although Hinds had told him that he and Jackson did not get along.

The State then rested.

Sgt. Cherry testified that he was living in Wayne Dumond's trailer and had gone to the base early that morning. About 12:00 p. m., he went to pick up his two younger children at their mother's home. When he got there they were waiting by the street and informed him that, "Mommy, Pete and Al Jackson—Al is in the house." He left the children.

Later that afternoon, Cherry went over to Dumond's home and Vera and Dubose appeared shortly thereafter. Vera had been crying and told her father that she, Dubose, her mother and Al Jackson had just had a fight because her mother would not sign to allow her to get married. He, Dubose and Vera got into his car and went to a cafe to discuss the situation. On the way back from the cafe, Cherry took Vera close to her mother's home and dropped her off. He and Dubose then went back to the Dumond house and Hinds came over. About 6:00 p. m., Vera called and asked Cherry if he would come over and talk to Al Jackson about her marriage problem. Dubose had taken Cherry's car and had driven over to Vera's house. When Vera called, Dubose was on his way back with Cherry's car. When Dubose came in he stated that Sgt. Peterson, a friend of Jackson's, was there and Dumond asked if Cherry wanted them to go along. The defendant suggested that they all go over in case "a fight starts." They all went in Cherry's car. Cherry had some wrenches in the back seat of his car. Cherry was the first one to walk into the house and saw Jackson and Vera sitting at the kitchen table. Cherry went into the kitchen and put his right hand on Jackson's shoulder while he was trying to get around Jackson's chair. Jackson started to stand up and Cherry told him to "sit down." Bill Hinds then hit Jackson two or three times. Jackson fell to the floor hitting the corner of the table and the chair. As of that time, Cherry had not struck a blow. Hinds then got down on the floor and hit Jackson one more time. Jackson got up and came at Cherry with a hammer. Cherry grabbed his arm and beat it against a counter until he dropped the hammer. By that time, Dumond was beating Jackson behind the head with a ratchet handle. Cherry denied hitting Jackson at any time with anything.

Cherry further testified that prior to the divorce, Mrs. Cherry had told Cherry that she was in love with another man, Al Jackson. Cherry approached Jackson in front of his Battery Commander and Jackson promised that he would stay out of the family's life until the divorce either went through or was dropped. However, Cherry saw his wife and Jackson together subsequent to that time and on other occasions.

Seven character witnesses were then called to show Cherry's reputation for truth and veracity.

The defendant Hinds then testified that he had known Cherry for about a year and that he knew that Cherry had domestic problems. He had testified at the divorce trial and subsequently Cherry asked him to keep an eye on his ex-wife to see if she was dating Al Jackson.

On the 4th day of August, Cherry and Dumond came to see Hinds at about 10:30 in the morning. Their conversation had to do with ways and means to get hold of Al Jackson. During the conversation, Krantz came in, overheard the topic of conversation, and suggested that the log books were kind of messed up. Hinds stated that he guessed that he could call Jackson with regards to his log book. Cherry stat-

ed that if they got him down there "we will jump him." Hinds called Jackson, but Jackson was not home.

About 5:30 p. m., Hinds, Cherry and Dubose went to Dumond's house. Dumond arrived at about 6:15. At that time, Cherry told them that he had worked out a deal with his daughter and Dubose to get Jackson alone in exchange for signing marriage papers. Cherry wanted Dumond and Hinds to go along with him in case Peterson was there.

They got into Cherry's car and when they got close to the Cherry house, Cherry stopped the car, went around to the trunk, got back in and produced two one-half inch drive ratchet handles. He handed one to Hinds and one to Dumond. They drove on to the parking lot of a real estate company where Dubose got out of the car and was gone about five minutes. He came back and stated that Jackson was all alone. They then drove to the Cherry residence.

Hinds further testified that all four went into the Cherry house. Cherry was the first one in the door and went directly to the kitchen, grabbed Jackson by the hair and hit him with his fist. Jackson tried to get out of his seat and Cherry put a headlock on him. Hinds admits that while they were scuffling he hit Jackson with the wrench handle. Hinds then dropped the ratchet and Cherry got hold of it and began to beat Jackson about the head and kick him in the ribs. Shortly thereafter, Cherry came out of the kitchen and first asked Dumond to go in and "finish him off." Dumond refused and Cherry then turned to Hinds and said "you do it." Hinds then said "No, it's yours; you do it." Cherry went back in and began to beat Jackson again with the ratchet handle. Dumond and Hinds joined Vera and Dubose in the bedroom and then decided that they better get out. Cherry and Jackson were still scuffling and Cherry was beating Jackson about the head and shoulders with a hammer. Dumond was in the kitchen by this time and he hit Jackson once as Hinds left out the front door.

■ The defendant first contends that the trial court committed reversible error in failing to grant the defendant a severance so that he and co-defendant Cherry could be tried separately. The defendant urges that the testimony of co-defendant Cherry was prejudicial to defendant and that certain evidence admitted during the trial would have been inadmissible if he had been tried separately. In the recent case of Curcie v. State, Okl.Cr., 496 P.2d 387, this Court stated the general rule that the granting of a severance is discretionary with the trial court, and that the Court of Criminal Appeals will not disturb the trial court's ruling, absent a showing that prejudice resulted therein. We are of the opinion that the trial court did not abuse its discretion in denying the severance in the instant case. If the co-defendant Cherry had refused to testify there would still be ample evidence to support the conviction of the defendant.

■ Where confessions are not involved, the mere fact that a co-defendant attempts to escape punishment by inculpating the defendant is not a sufficient ground for severance. United States v. Barber, 3 Cir., 442 F.2d 517; United States v. Bornstein, 7 Cir., 447 F.2d 742.

■ The mere fact that all the evidence is not admissible against a co-defendant does not necessitate a severance. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101.

In Spence v. State, Okl.Cr., 353 P.2d 1114, this Court held that weapons used by the accused or his co-actors in the commission of a crime are admissible into evidence. Therefore, for all of the reasons set out above, it is the opinion of this Court that the trial court did not abuse its discretion in denying defendant's motion for a severance and defendant's first proposition in error is without merit.

■ The defendant next contends that the judgment and sentence was not supported by the evidence. With this contention we cannot agree. In Gatewood v. State, 80

Okl.Cr. 135, 157 P.2d 473, this Court held as follows:

"\* \* \* If the killing is committed by the use of a dangerous instrument, then the question of intent, and the manner of using the instrument, and the conduct of the defendant, become questions for the consideration of the jury, as a question of fact. \* \* \*"

One who is present, aiding and abetting in a murder, is guilty as a principal, even though a co-actor does the actual killing. Walker v. State, 10 Okl.Cr. 533, 139 P. 711.

■ A thorough reading of the trial transcript reflects that there is adequate and sufficient evidence to take the case to the jury. This Court has held on many occasions that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence, as it is the exclusive province of the jury to weigh the evidence, judge the credibility of the witnesses and determine the facts. Smith v. State, Okl.Cr., 468 P.2d 807; Williams v. State, Okl.Cr., 373 P.2d 91. Therefore, the defendant's second proposition in error is without merit.

■ The defendant's last contention urges that the life sentence imposed is excessive. Suffice it to say that at the time of this trial the only sentence that could be imposed upon a conviction for murder was life imprisonment. Therefore, defendant's last contention is without merit.

For all the reasons set out above and from a consideration of the record as a whole, we do not find that the defendant has been deprived of a substantial right but that the issues were fairly presented to the jury and that the defendant received a fair and impartial trial. The judgment and sentence appealed from is accordingly affirmed.

BRETT and BUSSEY, JJ., concur.