**Guy Granville WILLIAMS, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F-80-581.**

Court of Criminal Appeals of Oklahoma.

Oct. 13, 1982.

As Corrected on Denial of Rehearing Dec. 2, 1982.

Jan Eric Cartwright, Atty. Gen., Jimmy D..Givens, Asst. Atty. Gen., Oklahoma City, for appellee.

Thomas R. Ray, Jr., Asst. Public Defender, Oklahoma County, Oklahoma City, for appellant.

## OPINION

CORNISH, Judge:

The appellant, Guy Williams, was convicted in Oklahoma County District Court of Grand Larceny, After Former Conviction of Three Felonies. The jury sentenced Williams to serve twenty (20) years' imprisonment.

Williams first contends that the State's circumstantial case against him was insufficient to support a conviction. He argues that the State's evidence, at most, raised but a mere suspicion of his guilt. In regard to this contention, a thorough recitation of the facts presented to the jury is necessary.

On July 18, 1979, Williams and his girlfriend, Wanda Smith[1], entered Treasures Incorporated, a jewelry store, ostensibly to purchase a diamond engagement ring. Pearl Otter, a salesperson at Treasures, Inc. testified that she waited on Williams and Smith on the date in question. Ms. Otter stated that when she asked if she could help them, Williams replied that, "he

1. The appellant and Wanda Smith were tried together for grand larceny. However, due to the jury being hopelessly deadlocked, a mistrial was declared as to co-defendant Smith.

wanted to see a round diamond in a carat-and-a-half size (1.5)." Williams also requested a white solitaire mounting. Ms. Otter then got a tray of white gold mountings and picked out two diamonds, one weighing 1.17 carats and another weighing 1.48 carats.

At this point, Williams informed Ms. Otter that he was particularly interested in the 1.48 carat diamond. Ms. Otter then placed the 1.48 carat on a pad and Williams picked up the diamond tweezers. Otter told Williams she would tweeze the diamond and put it in the mounting on Ms. Smith's finger. When Ms. Otter removed the diamond from the mounting Williams again reached for the diamond to examine it. Ms. Otter again told Williams she would put the 1.48 carat diamond in the locking tweezers and handed it to Williams. At that particular moment Ms. Smith reached across the display case in front of Ms. Otter, momentarily obstructing her view of Williams. During that split second Ms. Otter saw the stone bounce on the pad. She reached down and picked it up and put it back inside the display case. Ms. Otter then recovered the tweezers from Williams.

After having shown Williams and Smith the 1.48 carat diamond, Ms. Otter, at the request of Williams, showed them a marquis diamond. Williams then asked Ms. Otter to hold the marquis diamond for him and he would pay for it in a few days. When asked what his name was, Williams replied, "John Whithead." After looking at a few watches, Williams and Smith left the store.

When Williams and Smith left the store, Ms. Otter placed the 1.17 carat and the 1.48 carat diamonds on Ms. Leichter's desk to be weighed. Ms. Otter testified that it is standard practice to weigh all diamonds after they are shown. She further explained that she had weighed the 1.48 carat diamond that morning before it was shown to Williams and Ms. Smith.

Ms. Leichter, the owner of Treasures, testified that she observed Ms. Otter place the two diamonds on her desk. The diamonds were in their papers and paper clipped together on her desk. Ms. Leichter stated that she generally weighs the diamonds very soon after they are put on her desk. However, on the day in question, Ms. Leichter went to a funeral and the diamonds sat on her desk for about 45 minutes before they were weighed. She testified that when she returned from the funeral the diamonds were still paper clipped together and were in the same place and position on her desk. On cross-examination Ms. Leichter's testimony negated the possibility that an employee or delivery personnel could have tampered with the diamonds on her desk during her 45 minute absence.

Upon her return, Ms. Leichter weighed the two diamonds. To her dismay, what was supposed to be a 1.48 carat diamond was instead a synthetic cubic zirconium, weighing 2.67 carats. There was further testimony that a 2.60 carat cubic zirconium is equivalent in size to a 1.5 carat diamond, and whoever switched the diamond with the cubic zirconium was most probably aware of this fact.[2]

The State also called James Cain, an Oklahoma City detective. Cain testified that when Williams was arrested and given the *Miranda* rights he admitted being at

---

2. Ms. Leichter testified as follows:

Mr. Freeman (Defense Attorney): Wouldn't you think that if someone were clever enough to make an exchange of a diamond for a fake diamond, whatever, zirconium you call it, that they would be clever enough to say that they wanted to see a stone of the same weight for which they were going to exchange the fake stone.

Sydney Leichter: Mr. Freeman, let me explain something to you. No one in the store except Mrs. Otter and I was aware that a carat-and-a-half stone was being shown.

Q. My question—I'm sorry, go ahead and finish your answer.

A. Okay. So consequently an employee, if you're doing what you say, would have to know that this stone was being shown so that they would know what size cubic zirconium to have in their pocket to fit, because a cubic zirconium, they're going to have to have a two-and-a-half-carat cubic zirconium to be the same size as a one-and-a-half-carat diamond would be. But they just wouldn't know this, because we don't handle them. (Tr. 119–20)

Treasures, Inc. but denied stealing a diamond. When Cain asked Williams who his fiancee was, Williams replied her name was Faye, but he could not remember her last name. Williams later stated that he thought her last name was "Huffman" or "Hoffman."

In defense, Williams' co-defendant, Smith, testified as to her knowledge of the incident and her relationship with Williams. She stated that Williams called her on the day at issue and told her he wanted to buy her an engagement ring. She explained that they went to a couple of jewelry stores that day, including Treasures, Inc. Ms. Smith corroborated most of Ms. Otter's testimony of the events which took place at Treasures, Inc. However, she denied any knowledge or plan to switch a cubic zirconium for a 1.5 carat diamond. She further stated that Williams did not mention any such scheme to her either before or after their visit to Treasures, Inc.

The crucial decision to be made by this Court is whether the State's circumstantial evidence was sufficient to exclude every reasonable hypothesis except guilt. *Gray v. State,* 561 P.2d 83 (Okl.Cr.App.1977). The appellant relying upon *Palmer v. State,* 468 P.2d 799 (Okl.Cr.App.1970), argues that the State's evidence was insufficient for a conviction. In *Palmer,* supra at 800, this Court held that evidence which only establishes that the accused had an opportunity to steal the property, is insufficient to establish the crime of larceny. Evidence must raise more than a mere suspicion of guilt.

In this case, we find that the State met its burden of proof. The factual circumstances of this case when considered together are inconsistent with the innocence of the accused and are sufficient to support a conviction on circumstantial evidence.

## II

■ Williams next argues that his motions for mistrial should have been granted when the prosecutor attempted to introduce irrelevant evidence solely to prejudice the appellant. The State called three police officers to the witness stand. The trial

judge ruled their testimony to be irrelevant. When ruling on defense counsel's motion for a mistrial, the trial court stated:

> Well, I don't think the District Attorney is guilty of any improper actions. I think he is in good faith. And I think what he's trying to do is simply erroneous, and the Court has stopped him from doing that.

Further, the trial judge ruled that the testimony in question was not prejudicial. He also admonished the jury to disregard the testimony of the police officers when he sustained the appellant's relevancy objection. See *Kitchens v. State,* 513 P.2d 1300 (Okl.Cr.1973). Considering the trial judge's findings, we hold that the trial judge properly overruled the appellant's motions for mistrial.

## III

■ The appellant also asserts that the trial court erred by giving instruction No. 6. He complains of the following language:

> "The State relies for a conviction in this case *in part* upon what is known as "circumstantial evidence"; and in this connection you are instructed..." (Emphasis added).

The appellant argues that the trial court's use of the words "in part" creates an impermissable comment on the evidence. We addressed the identical issue in *Nichols v. State,* 418 P.2d 77 (Okl.Cr.1966). In *Nichols* supra at 84, we held that this instruction fairly and accurately stated the law. In this case there was direct evidence, i.e. that Williams was in Treasures Inc. on the day in question, which the jury could consider in conjunction with the other circumstantial evidence.

## IV

■ The appellant contends that the trial court committed error by not granting the appellant his motion for severance. The motion for severance was filed the morning of trial. Nowhere in the record does it appear that this motion was ever ruled on before trial by the trial court. Neither, was

this error alleged in the appellant's motion for new trial or in his petition in error. Generally, this lack of inclusion precludes the appellant from asserting this error on appeal. See *Turman v. State,* 522 P.2d 247 (Okl.Cr.1974).

This Court notes that the testimony of the co-defendant, cited as prejudicial in the appellant's brief, did not directly implicate the appellant in the theft of the diamond. Even if it had, "[T]he mere fact that a codefendant attempts to escape punishment by inculpating the defendant is not a sufficient ground for severance." *Hinds v. State,* 514 P.2d 947, 951 (Okl.Cr.1973). This Court has consistently held that a motion for severance is within the discretion of the trial court and absent a showing of abuse of such discretion, we will not overturn it. *Faubion v. State,* 569 P.2d 1022 (Okl.Cr. 1977). The appellant has failed to show an abuse of discretion.

## V

■ The appellant, lastly, asserts that 21 O.S.1981, § 51(B), the enhanced penalty statute under which he was sentenced, is unconstitutional. The appellant alleges that 21 O.S.1981, § 51(B) violates Article V, Section 57 of the Oklahoma Constitution which prohibits multi-subject legislation.

This precise contention was addressed by this Court in *King v. State,* 640 P.2d 983, 987 (Okl.Cr.1982). In *King,* this Court held:

An examination of the title of the bill reveals that it addresses the subject of crimes and punishments, thereby encompassing both the enhanced penalty statute and the traffic violations schedule. This constitutional provision should be interpreted liberally and broadly, with due regard to its purpose. The enhanced penalty statute does not violate Article 5, § 57 of the Oklahoma Constitution. (Citations omitted).

This Court reaffirms this holding today.

The judgment and sentence is AFFIRMED.

BUSSEY, J., concurs.

BRETT, P.J., dissents.